**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 24-90398 (CML) |
| | § | |
| SouthRock Capital Ltda., *et al.*[1] | § | Chapter 15 |
| | § | |
| | § | |
| Debtors in Foreign Proceeding. | § | (Joint Administration Pending) |
| | § | |

**JOINT VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN**
**PROCEEDINGS AND MOTION FOR ORDER GRANTING RELATED RELIEF**
**PURSUANT TO BANKRUPTCY CODE SECTIONS 1515, 1517, 1520 AND 1521**

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's Brazilian tax identification number, are as follows: (a) SouthRock Capital Ltda. (01-35); (b) Americana Franquia S.A. (01-51); (c) Brazil Airport Restaurantes S.A. (01-73); (d) HB Participações S.A. (01-57); (e) SRC 5 Participações Ltda. (01-02); (f) SRC 6 Participações Ltda. (01-41); (g) SRC Holding Participações S.A.(01-74); (h) SR N Participações S.A. (01-01); (i) Star Participações S.A. (01-09); (j) Starbucks Brasil Comércio de Cafés Ltda. (01-00); (k) SW do Brasil Ltda. (01-20); (l) SW Stores do Brasil Ltda. (01-36); and (m) Wahalla Ltda. (01-10).  The Debtors' mailing and service address is Avenida Paulista, 1294, 14º andar, sala 14, Bela Vista, Sao Paulo/SP, CEP 01310-915, Brazil.

1.      Fabio David Rohr ("Rohr"), in his capacity as Foreign Representative (the "Foreign Representative" or the "Petitioner") of SouthRock Capital Ltda. ("SouthRock"), Americana Franquia S.A. ("Americana"), Brazil Airport Restaurantes S.A. ("Brazil Airport"), HB Participações S.A. ("HBP"), SRC 5 Participações Ltda. ("SRC 5"), SRC 6 Participações Ltda. ("SRC 6"), SRC Holding Participações S.A. ("SRC Holding"), SR N Participações S.A. ("SRN"), Star Participações S.A. ("Star"), Starbucks Brasil Comércio de Cafés Ltda. ("Starbucks Brazil"), SW do Brasil Ltda. ("SWB"), SW Stores do Brasil Ltda. ("SWS"), and Wahalla Ltda. ("Wahalla") (collectively, the "Debtors"), which are subject of a Brazilian insolvency proceeding pending before the 1st Bankruptcy Court of the Central Forum of São Paulo, Brazil (the "Brazilian Bankruptcy Court") under case number "1153819-28.2023.8.26.0100," and pursuant to Federal Law No. 11.101 dated February 9, 2005 (as modified, the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil") (the "Brazilian Insolvency Proceeding" or "RJ Proceeding"), hereby files this verified petition and motion for related relief (the "Verified Petition") for entry of an order: (a) recognizing the Brazilian Insolvency Proceeding as foreign main proceedings pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"); (b) confirming relief pursuant to Bankruptcy Code section 1520; and (c) granting further relief pursuant to Bankruptcy Code sections 105(a), 1507(a), and 1521.  This Verified Petition refers to Chapter 15 of the Bankruptcy Code (11 U.S.C. §§ 1501–1532) as "Chapter 15" and to the proceeding resulting from this Verified Petition as this "Chapter 15 Proceeding."

2.      In support of this Verified Petition, the Petitioner files simultaneously herein and incorporates by reference (a) his declaration as the Foreign Representative of the Debtors (the "Rohr Declaration" or "Rohr Decl."); (b) the declaration of Lucas Rodrigues do Carmo, Esq., an

attorney advising the Debtors in the Brazilian Insolvency Proceeding (the "Carmo Declaration" or "Carmo Decl."); and (c) the declaration of Kenneth Steven Pope (the "Pope Declaration" or "Pope Decl.").

## **INTRODUCTION**

3.      The Foreign Representative commences this Chapter 15 Proceeding for two principal reasons.  The first is to obtain this Court's recognition of the Brazilian Insolvency Proceeding as foreign main proceeding.  Recognition will (a) stay ongoing and potential legal actions against the Debtors and their assets within the territorial jurisdiction of the United States, preserving the *status quo* so that creditors and/or other parties in interest cannot seize property or litigate outside of the Brazilian Insolvency Proceeding; (b) ensure the enforceability and effectiveness in the United States of the Brazilian Insolvency Proceeding; and (c) provide critical assistance to the Foreign Representative in maximizing the value of assets in the Brazilian Insolvency Proceeding.  The second reason is to ensure that no creditor can bypass the collective proceedings and effects of the Brazilian Insolvency Proceeding by taking actions that have detrimental impact on the collective action and ongoing compromise efforts, including (a) the termination of a key contractual relationship with the Debtors; and (b) continuing proceedings in the United States against Kenneth Pope ("Pope"), a key officer and (indirect) majority owner of the Debtors (the "U.S. Litigation").

4.      The Debtors and their affiliated entities (collectively, the "Group") are a large Brazilian food and beverage ("F&B") company founded in 2015 and operating in Brazil.  Rohr Decl. ¶ 3.  At the peak of its business, the Group held exclusive rights to use in Brazil brands such as TGI Fridays, Subway, Starbucks, and Eataly in more than 1,750 locations.  *Id.*, ¶ 4.  Also, the Group has its own multi-brand operators—Debtor Brazil Airport Restaurants and non-Debtor

affiliate Brazil Highway Ltda. ("Brazil Highway")—that operate in Brazil's largest and busiest airports and highways. *Id.*

5.      The COVID-19 had a devastating impact on the Group' business activities. *Id.*, ¶¶ 5, 53. Also, the persistent instability of the Brazilian economy further undermined the Group's financial situation. *Id.*, ¶¶ 5, 54. Over the last few years, the Group made great efforts to regain its financial footing, including through a business strategy oriented to the expansion of the Group's activities. *Id.*, ¶¶ 5, 55. In that respect, the Group raised capital by, among other things, (a) issuing debentures for R$125 million to two Brazilian funds (the "Debentures"); (b) borrowing a total of R$70 million from Banco Modal S.A. ("Banco Modal") and Banco Votorantim S.A. ("Banco Votorantim"), two Brazilian investment banks; and (c) borrowing R$116 million (or approximately $21.7 million) from Banco Daycoval, a Brazilian bank, which assigned its rights to Ibiuna Crédito Gestão de Recursos Ltda. ("Ibiuna"), a Brazilian asset management firm, and two Brazilian entities belonging to a Brazilian securitization firm.[2] *Id.* But the Group's efforts to financially recover were not sufficient, including because the Debtors increasingly struggled with working capital restrictions among financial institutions. *Id.*

6.      The unsound financial situation of the Group precipitated between September and October 2023, when (a) the Group defaulted on certain payments owed to the Ibiuna Group, causing an acceleration of the whole debt due to this group; and (b) Starbucks terminated its licensing agreements with the Group. *Id.*, ¶¶ 6, 56. Moreover, in October 2023, the Group failed to pay part of the debt owed to the two Brazilian funds, causing an acceleration of the Debentures

---

[2]     The two Brazilian entities belonging to a Brazilian securitization firm are Travessia Securitizadora de Créditos Financeiros XXXII S.A., and Travessia Travessia Securitizadora de Créditos Financeiros S.A. (collectively, "Travessia," and together with the Ibiuna, the "Ibiuna Group"). Rohr Decl. ¶ 5. For additional details regarding Group's borrowing activities relating to the Debentures, Banco Modal, Banco Votorantim, and the Ibiuna Group, *see infra* Section IV.

and making an amount of approximately R\$139 million (or approximately \$26.705 million) due in a matter of days. *Id.*

7.      Considering the foregoing, on October 31, 2023, SouthRock and the other twenty-one Debtors and non-Debtor affiliates[3] (collectively, the "2023 RJ Debtors") filed a petition (the "2023 Petition") with the Brazilian Bankruptcy Court to initiate the Brazilian Insolvency Proceeding. *Id.*, ¶¶ 7, 57.

8.      On December 12, 2023, the Brazilian Bankruptcy Court entered a decision commencing the Brazilian Insolvency Proceeding (the "2023 Acceptance Order"). *Id.*, ¶ 8, Ex. A. The entry of the 2023 Acceptance Order entailed a stay of several enforcement proceedings that certain creditors (mainly financial institutions and landlords) commenced in Brazil against the 2023 RJ Debtors for pre-2023 Petition debt. *Id.*, ¶¶ 9, 61. Through this stay, the 2023 RJ Debtors aimed for breathing space allowing them to focus on the restructuring and propose an arrangement with their creditors pursuant to Brazilian Bankruptcy Law. *Id.*, ¶ 9.

9.      In late 2023, SRC 5, SRN, SWB, and SWS (together with other affiliates of the Group) did not file for a restructuring because of their negotiations with certain creditors (mainly financial institutions and landlords) to compromise their debt out-of-court. *Id.*, ¶¶ 10, 58. However, a few months later, the same creditors engaged in aggressive loan recovery practices. *Id.* Moreover, Subway terminated a forbearance agreement it had entered with the Group, halting an important source of revenue. *Id.*, ¶ 10.

---

[3]      Namely: (a) SouthRock; (b) Southrock Centro de Serviços Administrativos Ltda.; (c) SRC D Participações Ltda.; (d) SRC 1 Participações Ltda.; (e) KD01 Participações Ltda.; (f) HBP; (g) SRC 6; (h) SRC Holding; (i) Southrock Lab S.A.; (j) Star Participações S.A.; (k) Starbucks Brasil; (l) Americana; (m) Brazil Highway; (n) Wahalla; (o) Vai Soluções Ltda.; (p) Vai Pay Soluções em Pagamento Ltda.; (q) Brazil Airport; (r) São Paulo Airport Restaurantes Ltda.; (s) Rio Airport Restaurantes Ltda.; (t) Sul Airport Restaurantes Ltda.; (w) Brasilia Airport Restaurantes Ltda.; and (x) Belo Horizonte Airport Restaurantes Ltda.

10.     These events led SRC 5, SRN, SWB, SWS, and other non-Debtor affiliates[4] (collectively, the "2024 RJ Debtors") to file a petition (the "2024 Petition") for a *recuperaçao judicial* proceeding before the Brazilian Bankruptcy Court (case number 1035517-06.2024.8.26.0100) on March 11, 2024.  *Id.*, ¶¶ 10, 58.

11.     On April 30, 2024, the Brazilian Bankruptcy Court entered a decision commencing the insolvency proceeding sought by the 2024 RJ Debtors (the "2024 Acceptance Order," and together with the 2023 Acceptance Order, the "Acceptance Orders").  *Id.*, ¶ 11, Ex. B.  The entry of 2024 Acceptance Order also stayed enforcement proceedings against the 2024 RJ Debtors for pre-2024 Petition debt.  *Id.*, ¶¶ 11, 67.

12.     On May 10, 2024, the Brazilian Bankruptcy Court entered an order providing for (a) the consolidation of the two Brazilian insolvency proceedings initiated by the Debtors; as well as (b) the substantial consolidation of the Debtors' assets and liabilities (the "Consolidation Order").  *Id.*, ¶ 12, Ex. C.  Because of the Consolidation Order, the Debtors are required to prepare and file a consolidated reorganization plan in the Brazilian Insolvency Proceeding—the reorganization plan that the Debtors aim to submit to the creditors' vote starting around the end of July 2024.  *Id.*, ¶¶ 12, 68.  If this timing is respected, the Group's expectation is that the Brazilian Bankruptcy Court will sanction the Debtors' consolidated reorganization plan in or around September 2024.  *Id.*, ¶¶ 13, 70.  Subject to further extension, the stay in the Brazilian Insolvency Proceeding lasts until October 27, 2024 (the "Brazilian Stay Deadline").  Carmo Decl., ¶ 59.

---

[4]     Namely: (a) Subway do Brasil Ltda. (now, SWB; (b) Southrock Foods S.A.; (c) Sport Participações S.A.; (d) SRN; (e) SRC 4 Participações Ltda.; (f) SRC 5; (g) Subway Brasil Participações S.A. (now, SW Participações S.A.); (h) Subway Stores do Brasil Ltda. (now, SWS); and (i) Subway Realty do Brasil Ltda. (now, Brazil Realty Ltda.).

13.     The Group expects to successfully restructure its business through the Brazilian Insolvency Proceeding because the recovery of the creditors in this scenario will be higher than in the event of liquidation of the Group under Brazilian Bankruptcy Law.  Rohr Decl. ¶¶ 13, 74.

14.     In this critical phase of the Brazilian Insolvency Proceeding, the Debtors now seek the protections afforded by Chapter 15 to (a) extend the effects of the Brazilian Insolvency Proceeding to the United States, including by protecting the Debtors and their U.S. assets from any ongoing and potential adverse action of the Brazilian Financial Creditors (as defined below), as well as creditors and other parties-in-interest; and (b) allow for an orderly and effective restructuring of the Group's debt through (i) their consolidated reorganization plan; and (ii) until such time as the Brazilian Bankruptcy Court rules on the consolidated reorganization plan, affording to Pope protection from adverse actions in the United States that are detrimental to the Debtors' restructuring efforts.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 1334(a) and (b), and 11 U.S.C. § 1501.  Venue is proper in this district pursuant to 28 U.S.C. § 1410(a)(1) and (3).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P). The Foreign Representative consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

### A.     Overview of the Group And Its Business Activities

16.     The Group to which the Debtors belong was founded in 2015 by Pope, an American entrepreneur who is the Group's Chief Executive Officer and (indirect) majority owner.  Rohr Decl. ¶ 3.

17.     In Brazil, the Group drove the expansion of some of the largest international restaurant chains such as (a) Starbucks (187 coffee shops); (b) TGI Fridays (four restaurants); (c) Eataly (six stores/restaurants); and (d) Subway (1593 restaurants).  *Id.*, ¶¶ 4, 17.  In addition, the Group carried out its F&B activities through two multi-brand operators (a) Debtor Brazil Airport, which, along with other Group's affiliates, operates 25 stores and restaurants in the main airports of Brazil (São Paulo, Rio de Janeiro, Brasilia, Florianopolis, and Belo Horizonte); and (b) Brazil Highway, which operates six of the Group's stores and restaurants on the main highways of the State of São Paulo.  *Id.*  To further expand its business and adapt to the changes of the F&B market, the Group developed the technology necessary for an automatization of its activities and started selling its products through online platforms.  *Id.*, ¶ 17.  In Brazil, the Group employs over 2,350 people and even more indirect employees.  *Id.*, ¶ 4.

18.     The Group is headed by Debtor Southrock, which is the main holding company.  *Id.*, ¶ 18.  Within the Group, the other Debtors are (a) sub-holding companies (Brazil Airport, Star, and SWB); (b) special purpose vehicles that the Group used for its borrowing and investment activities (HBP, SRC 5, SRC 6, SRC Holding, and SRN); and (c) operating companies (Americana, Starbucks Brazil, SWS, and Wahalla).  *Id.*, ¶¶ 19–26.

19.     All the Debtors are entities organized under the laws of Brazil.  *Id.*, ¶ 27.  The Debtors' registered office and principal place of business are located in the city of São Paulo, Brazil, which is also where the business operations generating most of the Group's revenues are carried out.  *Id.*  Also, São Paulo is where (a) the Debtors' "decision-making center" is located, as it is the place where the Group's management resides and works; (b) the Debtors maintain their central administration, including their cash management and accounting; and (c) the Debtors keep their accounts, books, and records.  *Id.*

20.     Almost all of Group's assets are located in São Paulo, which is the location of the largest number of restaurants and stores run by the Group, and where the Group executed its main contracts. *Id.*, ¶ 28.

21.     The majority of the Group's employees reside and work in São Paulo, while the remainder of the employees reside and work in other Brazilian states where the Group conducts its operations. *Id.*, ¶ 29.

**B.     The Debtors' Financial Status And Capital Structure**

22.     The Group's financial situation has gradually worsened since 2020.  Rohr Decl. ¶ 30.  At the end of 2023, the Group's consolidated assets were equal to $291.653 million, while the consolidated liabilities amounted to $493.593 million, resulting in equity of $201.94 million. *Id.*, ¶¶ 30, 31, Ex. F.  The Group's accumulated losses were $204.271 million. *Id*.  Further, at the end of 2023, the Group's liabilities included current and non-current loans and borrowing totaling $231.002 million. *Id.*, ¶ 31, Ex. F.  Of this amount, $207.676 million are unsecured and $23.326 million are secured. *Id.*

**1.     The Votorantim Notes**

23.     From October 2020 to July 2023, the Group borrowed a total of R$40 million from Banco Votorantim.  Rohr Decl. ¶ 32.

24.     On October 30, 2020, Debtors Starbucks Brasil and Brazil Airport executed the *Cédulas de Crédito Bancário* no. 163 and 168 (the "2020 Votorantim Notes"), under which (a) Starbucks Brasil and Brazil Airport cumulatively borrowed R$20 million (or approximately $3.805 million) from Banco Votorantim; and (b) Starbucks Brasil, Brazil Airport, Southrock, and Pope agreed to repay the principal amount, interest, and additional costs. *Id.*, ¶ 33.

25.     Further, on July 13, 2022, Debtor Starbucks Brasil *issued Notas Comerciais Escriturais* for R$20 million (or approximately $3.805 million) to Banco Votorantim (the "2022

Votorantim Notes," and together with the 2020 Votorantim Notes, the "Votorantim Notes").[5] *Id.*, ¶ 34. Southrock and Pope guaranteed the 2022 Votorantim Notes. *Id.*

26.     As of the end of October 2023, the outstanding amount owed to Banco Votorantim in connection with the Votorantim Notes was approximately R$22,265,910.15 (or approximately $4.326 million). *Id.*, ¶ 35.

### 2.     The Debentures

27.     From July 2021 to December 2021, Debtor HBP issued Debentures for R$125 million to (a) Ativos Especiais II - Fundo de Investimento em Direitos Creditórios – NP ("Ativos Especiais II"); and (b) Ativos Especiais III - Fundos de Investimento em Direitos Creditórios – NP (Ativos Especiais III, and together with Ativos Especiais III, the "Brazilian Funds").[6] Rohr Decl. ¶¶ 5, 36.

28.     Specifically, from July 9 and October 11, 2021, HBP issued Debentures for R$70 million under the Original Indenture.[7] *Id.*, ¶ 37. The Original Indenture is between (a) HBP, as "Issuer"; (b) Ativos Especiais II, as "Debentureholder"; and (c) Pope and Debtors Starbucks Brasil and Star as "Sureties." *Id.* The Original Indenture is subject to Brazilian law. *Id.*

29.     Also, on July 8, 2021, Pope and Ativos Especiais executed the First Capital Commitment Letter, requiring Pope to make one or more capital contributions to Starbucks Brasil or HBP if the latter fails to pay any amount due to Ativos Especiais II. *Id.*, ¶ 38.

30.     On November 9, 2021, HBP as "Issuer," Ativos Especiais II, and Ativos Especiais III entered into the "Amended Indenture," which incorporates all the obligations of the Original

---

[5]     The Votorantim Notes are subject to Brazilian law.  Rohr Decl. ¶¶ 33–34.

[6]     The Brazilian Funds, together with Banco Modal, Banco Votorantim, and the Ibiuna Group are collectively defined as the "Brazilian Financial Creditors."

[7]     Capitalized terms that are not otherwise defined have the meaning ascribed to them in the Rohr Declaration.

Indenture and makes Ativos Especiais III a Debentureholder. *Id.*, ¶ 39. Further, on November 10, 2021, Pope and the Brazilian Funds entered the Second Capital Commitment Letter, which is materially identical to the First Capital Commitment Letter.[8] *Id.*, ¶ 40.

31.     Following the execution of the Amended Indenture and the Second Capital Commitment Letter, Ativos Especiais III bought Debentures for R\$55 million. *Id.*, ¶ 41.

32.     As of October 23, 2023, the outstanding amount owed to the Brazilian Funds under the Debentures was R\$139,606,415.22 (approximately, \$26.705 million). *Id.*, ¶ 42.

### 3.     The Ibiuna Notes

33.     In late 2022, Debtors Starbucks Brasil and Wahalla issued 116,000 commercial notes (the "Ibiuna Notes"), borrowing a total of R\$116 million from Banco Daycoval, which simultaneously assigned its credits to the Ibiuna Group. Rohr Decl. ¶ 43.

34.     On November 1, 2022, Debtor Starbucks Brazil issued issued 75,000 Ibiuna Notes, borrowing R\$75 million from Banco Daycoval. *Id.*, ¶ 44. To borrow this amount, Starbucks Brazil committed to paying Banco Daycoval 48 fixed monthly installments until October 2026. *Id.* On November 1, 2022, Banco Daycoval assigned its credit rights relating to the Ibiuna Notes to the Ibiuna Group. *Id.*

35.     On December 14, 2022, Debtor Wahalla issued 41,000 Ibiuna Notes, borrowing additional R\$41 million Banco Daycoval. *Id.*, ¶ 45. To borrow such amount, Wahalla committed to paying Banco Daycoval 60 fixed monthly installments until December 2027. *Id.* On December 14, 2022, Banco Daycoval assigned its credit rights related to the Ibiuna Notes to Travessia. *Id.*

36.     SouthRock and Pope guaranteed of the Ibiuna Notes. *Id.*, ¶ 46.

---

[8]     The two Capital Commitment Letters are subject to New York law. Rohr Decl. ¶ 77.

37.     Between September 6 and 9, 2023, Debtors Starbucks Brasil and Wahalla defaulted on their respective monthly payments due to the Ibiuna Group, causing an acceleration of the remainder of the installments due to this group in relation to the Ibiuna Notes. *Id.*, ¶ 47.

### 4.     The Modal Note

38.     In early 2023, Debtor Starbucks Brasil executed a *Cedula de Credito Bancario*, Bank Credit No. 2303090001 (i.e., the "Modal Note"), under which (a) Starbucks Brasil borrowed R$30 million (or approximately $5.765 million) from Banco Modal; and (b) both Starbucks Brasil and Pope agree to repay the principal amount, interest, and additional costs.  Rohr Decl. ¶ 48.  The Modal Note is subject to Brazilian law.  *Id.*

39.     In addition, Pope and Banco Modal entered the Guaranty Agreement," pursuant to which Pope guaranteed the payment of all of Starbucks Brasil's obligations and liabilities under the Modal Note.[9]  *Id.*, ¶ 49.

40.     As of November 28, 2023, the outstanding amount owed to Banco Modal was R$35,167,674.64 (or approximately $6.702 million).  *Id.*, ¶ 50.

### C.     Events Leading To The Debtors' Financial Distress

41.     The COVID-19 pandemic significantly impaired the Debtors' business activities, including by forcing the Group to close its restaurants and coffee shops for several months.  Rohr Decl. ¶ 53.   Indeed, in 2020 and 2021, the pandemic caused the Debtors' revenues to fall by 95% and 70%, respectively.  *Id.*  Moreover, the pandemic led to (a) high default rates by the Group's suppliers and commercial partners; and (b) cost increases throughout the production chain, making it extremely difficult for the Group to do business.  *Id.*   On top of that, the Debtors' financial situation further deteriorated because of to the instability and recession of the Brazilian economy,

---

[9]     The Guaranty Agreement is subject to Texas law.  Rohr Decl. ¶ 49.

characterized by the volatility of interest rates and several exchange rate changes that unbalanced the Brazilian market and negatively impacted Brazilian businesses. *Id.*, ¶ 54.

42.     Over the last few years, the Group has made great efforts to regain its financial footing, including through a business strategy that aimed to expand the Group's activities. *Id.*, ¶ 55.   Accordingly, the Group (a) issued the Debentures for R$125 million to the Brazilian Funds; (b) borrowed R$70 million from Banco Votorantim and Banco Modal; and (c) borrowed R$110 million from Banco Daycoval (which assigned its credit to the Ibiuna Group). *Id.* But the Group's recovery efforts were not sufficient to overcome its crisis, including because the Debtors increasingly struggled with working capital restrictions among financial institutions. *Id.*

43.     The more and more precarious financial situation of the Group precipitated between September and early October 2023, when (a) the Group defaulted on certain payments owed to the Ibiuna Group, causing an acceleration of the whole debt due to this group; and (b) Starbucks terminated its licensing agreements with the Group. *Id.*, ¶ 56.   Moreover, in October 2023, the Group failed to pay part of the debt owed to the two Brazilian funds, causing an acceleration of the Debentures and making an amount of approximately R$139 million (or approximately $26.705 million) due in a matter of days. *Id.*

44.     Considering the foregoing, to rescue the 2023 RJ Debtors from their financial turmoil and achieve the best outcome for all the creditors, the 2023 RJ Debtors found it necessary to seek the Brazilian Bankruptcy Court's protection by initiating, on October 31, 2023, the Brazilian Insolvency Proceeding. *Id.*, ¶ 57.

45.     Following the initiation of the Brazilian Insolvency Proceeding, other Debtors of the Group worked with their respective creditors to compromise their debt through an out-of-court debt reorganization. *Id.*, ¶ 58.   However, a few months later, the same creditors started engaging

in aggressive loan recovery practices, such as filing enforcement proceedings and pursuing preliminary injunctions against the Debtors' assets and bank accounts. *Id.* Accordingly, similarly to other companies of the Group, the 2024 RJ Debtors sought the protection of the Brazilian Bankruptcy Court by commencing their respective *recuperaçao judicial* proceeding in March 2024. *Id.*

### D. The Brazilian Insolvency Proceeding

46.     As mentioned above, on October 31, 2023, the 2023 RJ Debtors filed the 2023 Petition with the Brazilian Bankruptcy Court to initiate the Brazilian Insolvency Proceeding and obtain relief, including a stay of ongoing and potential enforcement proceedings commenced against the 2023 RJ Debtors. Rohr Decl. ¶ 59.

47.     On November 1, 2023, the Brazilian Insolvency Court appointed *Laspro Consultores* (the "Judicial Administrator"), a Brazilian firm specialized in bankruptcy matters, and requested that the Judicial Administrator prepare a report analyzing whether the requirements for accepting the 2023 RJ Debtors' *recuperaçao judicial* proceeding were met. *Id.*, ¶ 60.

48.     On December 12, 2023, following the issuance of the Judicial Administrator's report, the Brazilian Bankruptcy Court entered the 2023 Acceptance Order. *Id.*, ¶ 61. The entry of the 2023 Acceptance Order has entailed a stay of the several enforcement proceedings that creditors commenced in Brazil against the 2023 RJ Debtors for pre-2023 Petition debt.[10] *Id.*

---

[10]     Regarding the importance of the stay, in the 2023 Acceptance Order, the Brazilian Bankruptcy Court noted the following: "[E]ven with the determination of the stay period and the consolidated caselaw of the Superior Court of Justice on the competent jurisdiction of the Court of the court-supervised reorganization to resolve on the essentiality of the assets owned or possessed by the company being reorganized, reality has proven the existence of several acts of asset freeze against the debtor entered in various Courts, at the provocation of creditors subject or not to court-supervised reorganization, without any discussion on the essentiality of the assets subject to prosecution. **This situation, in addition to causing an immense number of unnecessary conflicts of jurisdiction in view of the already consolidated understanding of the Superior Court of Justice, compromises the cash flow and operational activities of the business under reorganization, owing to the blocking of the asset in the specific case, preventing its use precisely at the time of greatest need of the**

49.     On February 9, 2024, the 2023 RJ Debtors filed their reorganization plan.[11]  *Id.*, ¶ 62.

50.     On March 11, 2024, the 2024 RJ Debtors also filed their 2024 Petition with the Brazilian Bankruptcy Court.  *Id.*, ¶ 63.

51.     On March 21, 2024, the Brazilian Bankruptcy Court ordered the Judicial Administrator to opine on the *recuperaçao judicial* proceeding commenced by the 2024 RJ Debtors.  *Id.*, ¶ 64.  In April 2024, the Judicial Administrator filed its report with the Brazilian Bankruptcy Court, requesting the substantial consolidation between the 2023 RJ Debtors and the 2024 RJ Debtors.  *Id.*

52.     On April 8, 2024, in view of the potential substantial consolidation between the Debtors, the Brazilian Bankruptcy Court ordered the Judicial Administrator to amend the report it had initially filed when assessing whether the Brazilian Insolvency Proceeding could be accepted in 2023.  *Id.*, ¶ 65.

53.     On April 18, 2024, the Judicial Administrator filed its report, which (a) attested the fulfilment of the Brazilian law requirements for accepting the *recuperaçao judicial* proceeding

---

company being reorganized, in addition to disturbing the negotiating environment aimed by Law 11101/2005, which is present during the processing of the court-supervised reorganization.  In the case of claims subject to court-supervised reorganization, the illegality of the creditor's conduct that seeks the foreclosure of assets outside the reorganization record is even more conspicuous, precisely because it seeks to circumvent the subjection of its claim as determined by Article 49 of Law 11101/2005, when attempting to arrange payment in noncompliance with a legal provision, through a manifestly incompetent court. Therefore, there is no legal basis for the creditor with claim subject to court-supervised reorganization to seek an incompetent judgment with a view to obtaining a satisfactory court remedy, since its claim should be complied with under the terms of the court-supervised reorganization plan approved in AGC or in bankruptcy record if there is a conversion of the court-supervised reorganization into bankruptcy…. The worst scenario is to allow creditors, subject or not to court-supervised reorganization, aware of the existence of the process, still seek to utilize the assets of the company being reorganized, without prior discussion of essentiality already recognized as necessary by the Superior Court of Justice, in order to further burden the court system with the useless proliferation of procedures, in addition to posing risk on the business that seeks to recover itself." Rohr Decl. ¶ 8, Ex. A (Emphasis added).

[11]    However, the reorganization plan filed in February 2024 is no longer relevant due to the Consolidation Order issued by the Brazilian Bankruptcy Court.  Rohr Decl. ¶ 62.

initiated by the 2024 RJ Debtors; and (b) gave its positive opinion regarding a potential substantial consolidation between the assets, liabilities, and the Brazilian insolvency proceedings commenced by the Debtors.  *Id.*, ¶ 66.

54.     On April 30, 2024, the Brazilian Bankruptcy Court entered the 2024 Acceptance Order, staying enforcement proceedings against the 2024 RJ Debtors for pre-2024 Petition debt. *Id.*, ¶ 67.

55.     On May 10, 2024, the Brazilian Bankruptcy Court entered the Consolidation Order. *Id.*, ¶ 68.  The Brazilian Bankruptcy Court ordered the substantial consolidation between the Debtors, given that the Judicial Administrator had attested (a) the interconnection and co-mingling of assets between the 2023 and 2024 RJ Debtors; and (b) the fulfillment of all other requirements for ordering a substantial consolidation under Brazilian Bankruptcy Law.  *Id.*; *see also* Carmo Decl. ¶¶ 48, 60.  Due to the Consolidation Order, the Debtors' assets and liabilities are substantially consolidated for the purposes of the Brazilian Insolvency Proceeding.  Rohr Decl. ¶ 68.  In the Brazilian Insolvency Proceeding, the current Brazilian Stay Deadline is October 27, 2024.  Carmo Decl. ¶ 59.

56.     On May 22, 2024, the Judicial Administrator filed a petition, requesting a new procedural timetable because of the Debtors' substantial consolidation.  Rohr Decl. ¶ 69.  If the procedural timetable is accepted by the Brazilian Bankruptcy Court (which should occur in the next few weeks), the Debtors must file their consolidated reorganization plan within fifteen days from the publication of the 2024 Acceptance Order on the Official Gazette, which should also take place in the next few weeks.  *Id.*; *see also* Carmo Decl. ¶¶ 13, 61.

57.     If these steps are accomplished, the Debtors expect that their general creditors meeting will take place starting from July 31, 2024, and the Brazilian Court will sanction the Debtors' consolidated reorganization plan in or around September 2024.  *Id.*, ¶ 70.

58.      At this juncture, the Brazilian Insolvency Proceeding is expected to last until, at least, September 2026 (i.e., following the two-year period of judicial supervision after the reorganization plan is approved by creditors and court-sanctioned).  Carmo Decl. ¶ 62.

**E.     Group's Restructuring Efforts In Relation To The Brazilian Insolvency Proceeding**

59.     As part of its restructuring efforts, the Group has entered into a sale and purchase agreement of its Starbucks business (the "SPA").  Rohr Decl. 71.  Under the SPA, among other things, the Group agreed to sell the assets of Debtor Starbucks Brasil for a base price of R$120 million (or approximately $22.72 million), subject to price adjustments at the closing of the transaction.  *Id.*  The net proceeds relating to the sale of the Starbucks business will be distributed to the creditors in accordance with the (to-be-filed) consolidated reorganization plan that will be subject to the creditors' vote in the Brazilian Insolvency Proceeding.  *Id.*

60.     In addition, the Group is negotiating a debtor-in-possession financing of R$25 million (or $4.73 million) with certain investors (the "DIP Loan").  *Id.*, 72.   The DIP Loan's proceeds will be used to strengthen and grow the Group's ongoing businesses by expanding the number of its stores and renovating those already owned.  *Id.*  Through this strategy, the Debtors expect to generate additional cashflow that will be used to maximize the recovery of all creditors in the Brazilian Insolvency Proceeding.  *Id.*  In particular, the Group aims to build new stores and renovate the remaining business, causing a 70% increase of the Group's revenues when this strategy is implemented.  *Id.*

61.     Moreover, the Group is negotiating with Brazilian authorities a repayment plan that would decrease its current tax liability and extend the period within which the Debtors are required to pay this negotiated amount (up to 120 instalments).  *Id.*, 73.

62.     The Group expects to successfully restructure its business through the Brazilian Insolvency Proceeding because the recovery of the creditors in this scenario will be higher than in the event of liquidation of the Group.  *Id.*, 74.

**F.      The U.S. Litigation**

63.     Following the filing of the 2023 Petition, the Brazilian Financial Creditors—which had pending litigation against the Debtors and Pope in Brazil in relation to the Group's restructuring—started proceedings against them or their assets in the United States (the "U.S. Litigation").  Rohr Decl. ¶ 75.

64.     Around mid-November 2023, Banco Modal filed a lawsuit against Pope in the District Court of Harris County, Texas (the "Texas Collection Proceeding").  *Id.*, ¶ 76.  Through the Texas Collection Proceeding, Banco Modal aims to recover the Banco Note that Pope guaranteed via the Guaranty Agreement.  The Texas Proceeding, in which Pope is acting *pro se*, is ongoing.  *Id.*

65.     Further, on November 30, 2023, the Brazilian Funds filed a lawsuit against Pope in the Supreme Court of the State of New York County of New York (the "New York Proceeding").  *Id.*, ¶ 77.  The Brazilian Funds initiated the New York Proceeding to (i) to compel Pope to make capital contributions totaling R$270,750,981.05 (or approximately $51.902 million) to certain of the Debtors pursuant to two Capital Commitment Letters; and (ii) seek damages.  *Id.*  In the New

York Proceeding, the Brazilian Funds obtained an order attaching Pope's bank accounts.[12]  *Id.*
The New York Proceeding, in which Pope is acting *pro se*, is ongoing.  *Id.*

66.     Moreover, in early May 2024, the Ibiuna Group commenced a proceeding against
SouthStone (i.e., Pope's investment vehicle) and The Pope Terry D & Barbara A The Pope 2007
Revoc. Trust (reportedly maintained by Pope's parents) in the U.S. District Court for the Eastern
District of Texas (the "Texas Discovery Proceeding").  *Id.*, ¶ 78.  Through the Texas Discovery
Proceeding, the Group Ibiuna is seeking discovery relating to the Group from the targets of this
proceeding.  *Id.*  On June 8, 2024, the Ibiuna Group served a related subpoena on Pope's parents
at their home in Texas.  *Id.*

67.     In addition, on or around May 9, 2024, Banco Votorantim S.A. ("Banco
Votorantim"), a Brazilian bank, filed an action against Debtors SouthRock, Starbucks Brasil,
Brazil Airport, and Pope in the Eleventh Judicial Circuit of Florida, Miami-Dade County (the
"Florida Enforcement Proceeding").  *Id.*, ¶ 79.  Banco Votorantim commenced the Florida
Proceeding to record a Brazilian judgment pursuant to Florida's Uniform Out-of-Country Money
Judgment Recognition Act.  *Id.*  Pursuant to this Brazilian judgment, Pope and Debtors SouthRock,
Stakbucks Brail, and Brazil Airport owe R$7,540,709.27 (or approximately $1.444 million) to
Banco Votorantim.  *Id.*  This Brazilian judgment cannot be enforced against the Debtors due to the
stay under the Brazilian Insolvency Proceeding.  Id., ¶ 80.

---

[12]     Pope's only assets in the United States consist of (a) a bank account held with UBS with a balance of
approximately $21,518.99 (the "UBS Account"); (b) an account held with Goldman Sachs with a balance of
approximately $1,152 (the "GS Account"); (c) an account with Bank of America holding approximately $675.46
(the "BoA Account"); and (iv) 100% of equity of SouthStone. Pope Decl. ¶ 4.  Pope held the funds in the UBS
Account and the GS Account to pay the legal fees he incurred during legal proceedings for the custody of his
children.  *Id.*, ¶ 7.  The BoA Account is funded by alimonies paid by Pope's ex-spouse for the maintenance of
their children. Pope Decl.  *Id.*, ¶ 8.  SouthStone holds an account with Goldman Sachs with a balance of
$18,191.  *Id.*, ¶ 14.

68.     Also, on or around May 13, 2024, Banco Votorantim filed another judgment enforcement proceeding against Debtors SouthRock and Starbucks Brasil, along with Pope, in the 467th District Court in Denton County, Texas (the "Texas Enforcement Proceeding").  *Id.*, ¶ 81. To date, neither SouthRock, nor Starbucks Brasil, nor Pope have been served in connection with the Texas Enforcement Proceeding, which appears being related to the 2022 Votorantim Notes. *Id.*  In Brazil, the Brazilian judgment relating to the 2022 Votorantim Notes also cannot be enforced against the Debtors due to the insolvency stay.  *Id.*

69.     The purpose of the U.S. Litigation is to create additional leverage against the Debtors and Pope for debt that remains subject to and stayed by (as to the Debtors) the Brazilian Insolvency Proceeding.  *Id.*, ¶ 82.  To date, Pope has been absorbed by the U.S. Litigation, consuming almost all time and energies that Pope could have devoted to his strategic and key activities as CEO of the Group.  *Id.*  In particular, the U.S. Litigation restrained Pope's capability to (a) fully focus on the Group's Brazilian Insolvency Proceeding; (b) negotiating with creditors; (c) raise capital; and (d) identify new investors and closing strategic opportunities for the Group's growth during and after his rehabilitation through the Brazilian Insolvency Proceeding—activities that all contribute to the Group's restructuring, protecting approximately 1300 jobs in Brazil, and maximizing the recovery for all creditors.  *Id.*

## THE FOREIGN REPRESENTATIVE

70.     Rohr, the Petitioner and Foreign Representative, is the Group's Chief Financial Officer, and a shareholder of Southrock, of which he owns a minority stake of five percent.  Rohr Decl. ¶ 15.  Also, Rohr serves as a director of 11 Debtors (SouthRock, Americana, Brazil Airport, HBP, SRC 5, SRC 6, SRC Holding, SRN, Star, Starbucks Brasil, and Wahalla).  Rohr is a Brazilian citizen and permanent resident.  *Id.*

71.    Between June 7 and 12, 2024, via board resolutions, each of the Debtors granted Rohr authority to represent it as its Foreign Representative in the Chapter 15 Proceeding in the United States.  *Id.*, ¶ 16, Ex. D.

## PROPERTY LOCATED IN THE UNITED STATES

72.    While most of the Debtors' property is in Brazil, on or around November 19, 2018, Debtor Americana and TGI Fridays Franchisor, LLC ("TGIF Franchisor"), a Delaware limited liability company with principal offices located in Dallas, entered the "Franchise Agreement" in connection with the opening of a TGI Fridays restaurant in São Paulo (the "TGIF Agreement," as amended).  Rohr Decl. ¶ 51.  The TGFI Agreement designates Texas as the governing law and the venue for proceedings arising out of its terms.[13]  *Id.*

73.    In addition, the Debtors paid a cash retainer to Quinn Emanuel Urquhart & Sullivan, LLP in connection with this case, and maintains an interest in the unearned portion of these retainer funds at a Houston branch of Bank of America.  *Id.*, ¶ 52.

## RELIEF REQUESTED

74.    The Petitioner respectfully requests that this Court enter an order, substantially in the form of the proposed order attached hereto as Appendix A (the "Proposed Order"), pursuant to sections 105(a), 1507(a), 1515, 1517, 1520, 1521(a) and 1521(b) of the Bankruptcy Code, that:

      a.  recognizes the Brazilian Insolvency Proceeding as foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) and grants the Debtors all of the

---

[13]    Specifically, clause 27.07 of the TGIF Agreement provides: "The internal laws of the State of Texas (without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction) that would cause the application of laws of any other jurisdiction) govern all matters arising out of or relating to this Agreement and its exhibits and schedules and all of the transactions it contemplates, including its validity, interpretation, construction, performance and enforcement and any disputes or controversies arising therefrom. Franchisee and each Principal hereby irrevocably consent to personal jurisdiction in any court of competent jurisdiction in which Friday's may elect to bring an Action pursuant to the provisions of this Agreement (including. without limitation, the state and federal courts located in Dallas County, Texas, U.S.A.) and Franchisee and each Principal hereby irrevocably waive, to the fullest extent permitted by law, any objection to venue in any such court (including, without limitation, the state and federal courts located in Dallas County, Texas, U.S.A.)." Rohr Decl. ¶ 51.

relief afforded to such proceeding pursuant to section 1520 of the Bankruptcy Code and grants the Debtors all of the relief requested herein pursuant to section 1521 of the Bankruptcy Code;

b.  recognizes the Petitioner as a "Foreign Representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code;

c.  entrusts the administration, realization and distribution of any and all of the Debtors' assets within the territorial jurisdiction of the United States to the Petitioner, pursuant to sections 1521(a)(5) and 1521(b) of the Bankruptcy Code;

d.  to the extent not already provided in 11 U.S.C. § 1520, enjoins all creditors and other persons from (a) disposing or otherwise taking any action against any property of the Debtors; and (b) taking or continuing any act to obtain possession of, or exercise control over, such property;

e.  to the extent not already provided in 11 U.S.C. § 1520, enjoins the commencement of any suit, action or proceeding in the territorial jurisdiction of the United States to resolve any dispute arising out of the Brazilian Insolvency Proceeding or any orders issued by the Brazilian Bankruptcy Court identified in the Verified Petition, or the Brazilian law relating thereto;

f.  provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with any Brazilian Bankruptcy Court order, any order entered in respect of the Verified Petition, this Chapter 15 Proceeding, any further order for additional relief in this Chapter 15 Proceeding, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

g.  pursuant to sections 1521(a)(6) and 1521(a)(7) of the Bankruptcy Code, pending approval of a reorganization plan, extends all prior relief granted to the Debtors or the Foreign Representative by this Court pursuant to section 1519(a) or 1521 of the Bankruptcy Code, with the consequence that such prior relief remains in full force;

h.  provides that such order is immediately effective and enforceable after its entry, that the Foreign Representative is not subject to any stay in the implementation, enforcement or realization of the relief granted in such order, and that the Foreign Representative and the Debtors are authorized and empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of such order;

i.  provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of such order; and

j.  provides related relief and such other and further relief as the Court deems proper and just (together with the relief requested in sub-paragraphs (a) through (i), the "Relief Requested").

## **BASIS FOR RELIEF**

75.     The Relief Requested is based on the provisions of Chapter 15 of the Bankruptcy Code.  As directed by the statute, in interpreting Chapter 15, a court is to "consider its international origin, and the need to promote an application of [Chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.

76.     Section 1517(a) provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code; (b) the foreign representative applying for recognition is a person or body; and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code.  *See, e.g.*, *In re Inversora Electrica de Buenos Aires S.A.*, 560 B.R. 650, 653–54 (Bankr. S.D.N.Y. 2016); *In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008); *In re Petroforte Brasileiro de Petroleo Ltda.*, Case No. 1:14-bk-15408, ECF No. 7 (Bankr. S.D. Fla. Mar. 7, 2014) (granting recognition of foreign proceeding under section 1517(a)); *In re Metrofinanciera, S.A.P.I. de C.V.*, Case No. 2:10-bk-20666, ECF No. 40 (Bankr. S.D. Tex. Sept. 24, 2010) (same).

## A.  **The Brazilian Insolvency Proceeding Should Be Recognized As A Foreign Main Proceeding**

77.     The Brazilian Insolvency Proceeding is a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code.  Bankruptcy Code section 101(23) defines "foreign proceeding" as "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which

proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

78.     Here, there is no dispute that the Brazilian Insolvency Proceeding is an insolvency proceeding brought under the Brazilian Bankruptcy Law, which provides a statutory means for applicants thereunder to reorganize their financial affairs subject to the supervision of a court. Carmo Decl. ¶¶ 7, 8, 36, 39, 63(a).  Specifically, approval of the Brazilian Bankruptcy Court is necessary for the Debtors' Reorganization Plan accepted by creditors to become effective, and the Brazilian Bankruptcy Court will retain jurisdiction to enforce the terms of the Debtors' reorganization plan.  *Id.*, ¶¶ 24–25, 30–31, 35–38.

79.     The Debtors' Brazilian Insolvency Proceeding is pending in a foreign country (Brazil) under a law relating to insolvency, *see id.* ¶¶ 2, 7, pursuant to which the assets and affairs of a debtor are subject to the control and supervision of the Brazilian Bankruptcy Court.  *Id.* ¶ 18. Indeed, the Brazilian Bankruptcy Law has many features in common with or similar to the Bankruptcy Code, such as the debtor remaining in possession, a mechanism for binding dissenting creditors, and a general policy of just and fair treatment of creditors.  *Id.* ¶¶ 18, 29–30, 39–43.

80.     Moreover, to protect a debtor and its creditors from particular creditors foreclosing on the debtor's assets to the detriment of the others, the Brazilian Bankruptcy Law also provides for a general stay (similar to the Bankruptcy Code's automatic stay) that entails the temporary suspension of enforcement proceedings against a debtor, aiming to prevent a "race to the courthouse" in order to allow for the plan negotiation process to progress constructively.  Carmo Decl. ¶ 14.

81.     Further, the Brazilian Insolvency Proceeding is "collective" in nature because it is comprehensive as to all of the debtor's assets and creditors.  *See In re British Am. Ins. Co.*, 425

B.R. 884, 902 (Bankr. S.D. Fla. 2010); *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010) ("A proceeding is collective if it considers the rights and obligations of all creditors."), *aff'd*, 728 F.3d 301 (3d Cir. 2013); *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 270 (Bankr. S.D.N.Y. 2019) (holding that a Brazilian *recuperaçao judicial* process satisfies the standards for a "foreign proceeding," including being a collective proceeding); Carmo Decl. ¶ 63(a). Courts addressing whether a proceeding is "collective" look to such proceeding's consideration of creditors in general. In contrast, non-collective proceedings, such as foreclosure proceedings, for example, are instituted to protect the rights of a single, secured creditor. *See In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009); *ABC Learning Ctrs.*, 445 B.R. at 334–35 (using the term "all creditors" to mean creditors in general). Thus, provided that a proceeding "contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action," it is "collective" in nature. *British Am. Ins.*, 425 B.R. at 902; *see In re British Am. Isle of Venice (BVI), Ltd.*, 441 B.R. 713, 717–18 (Bankr. S.D. Fla. 2010) (holding that proceeding was collective in nature where all creditors had right to be heard).

82.     The Brazilian Insolvency Proceeding aims to ensure fair treatment of the broad array of creditors and stakeholders by, among other things, (a) staying enforcement proceedings so that individual creditors may not obtain an advantage over similarly situated creditors; (b) preventing the debtors from making preferential payments to creditors; and (c) providing procedures for voting to accept or reject a reorganization plan. Carmo Decl. ¶¶ 14, 22–29.

83.     Courts in the United States have repeatedly held that judicial restructuring proceedings governed by Brazilian Bankruptcy Law (such as the Brazilian Insolvency Proceeding) are "foreign proceedings" within the meaning of the Bankruptcy Code. *See, e.g.*, *U.S.J. – Açúcar*

*e Álcool S.A.*, *et al.*, Case No. 22-10320 (DSJ), ECF. No. 21 (Bankr. S.D.N.Y. Apr. 14, 2022) (recognizing, as a foreign main proceeding, a *recuperaçao judicial* proceeding under Brazilian Bankruptcy Law); *Samarco Mineracao S.A. - Em Recuperação Judicial*, Case No. 21-10754 (LGB), ECF No. 22 (Bankr. S.D.N.Y. May 13, 2021) (same); *In re Novonor S.A.*, No. 19-12731 (SMB), Case No. 22 (Bankr. S.D.N.Y. Sept. 18, 2019) (same); *In re Oi S.A.*, Case No. 16-11791 (SHL), ECF No. 38 (Bankr. S.D.N.Y. July 22, 2016) (same); *In re OAS S.A.*, No. 15-10937 (SMB), ECF 85 (Bankr. S.D.N.Y. Aug. 3, 2015) (same); *In re Rede Energia S.A.*, No. 14-10078 (SCC), ECF No. 36 (Bankr. S.D.N.Y. Sept. 9, 2014) (same).   Accordingly, the Debtors' Brazilian Insolvency Proceeding qualifies as a "foreign proceeding" under the Bankruptcy Code.

84.   Beyond qualifying as a "foreign proceeding" under section 101(23), the Brazilian Insolvency Proceeding qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests."  *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding "is pending in the country where the debtor has the center of its main interests").

85.   First, the Brazilian Bankruptcy Court has acknowledged that the Brazilian Insolvency Proceeding is a "foreign main" proceeding, by granting the Acceptance Orders that the Debtors have their center of main interest in Brazil.  Carmo Decl. ¶ 53.  Although the term "center of main interests" (or "COMI") is not defined in the Bankruptcy Code, a debtor's COMI is presumed to be located at its registered office.  *See* 11 U.S.C. § 1516(c).  In the Acceptance Orders, the Brazilian Bankruptcy Court has also noted that the each of the Debtors has a registered office in Brazil.  Carmo Decl. ¶ 5(a).

86.     In addition to the location of the debtor's registered office, courts have identified

five non-exhaustive factors in determining a debtor's COMI:

    a.  the location of those who actually manage the debtor (which may be the
       headquarters of a holding company);

    b.  the location of the debtor's headquarters;

    c.  the location of the debtor's primary assets;

    d.  the location of the majority of the debtor's creditors or the majority of the creditors
       affected by the case; and/or

    e.  the jurisdiction whose law would apply to most disputes.

*See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y.

2007); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R.

122, 128 (Bankr. S.D.N.Y. 2007).

87.     The Debtors' respective registered offices are in Brazil and essentially all of their

corporate business is conducted and directed from Brazil.  *See* Rohr Decl. ¶ 27.  Specifically, (a)

the Debtors are Debtors organized under the laws of Brazil, which is where they have their

respective headquarters, registered offices and principal places of business; (b) the Debtors' senior

management is based in Brazil; (c) the Debtors house all their cash management and accounting

functions in Brazil; (d) the Debtors' employees are residents of and work in Brazil; and (e) the

majority of the Debtors' assets are in Brazil.  *Id.*, ¶¶ 27–29.

88.     For all the foregoing reasons, the Brazilian Insolvency Proceeding is, and should

be recognized as, a foreign main proceeding.

**B.      The Petitioner Is A Foreign Representative Who Is A Person**

89.     The second requirement for recognition of a foreign proceeding under section

1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a

"person or body."  11 U.S.C. § 1517(a)(2).

90.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Under section 101(41), the "term 'person' includes [an] individual." 11 U.S.C. § 101(41).

91.     The Petitioner is an individual who has been authorized and appointed by the Debtors to serve as their Foreign Representative. *See supra* ¶ 71. Thus, Rohr satisfies the second requirement for entry of an order recognizing each of the Brazilian Insolvency Proceeding as a foreign main proceeding. *See, e.g.*, *In re Andrade Gutierrez Engenharia S.A.*, 645 B.R. 175, 183 (Bankr. S.D.N.Y. 2022) (holding that the foreign representative duly authorized by the chapter 15 debtors' board of directors was a foreign representative within 11 U.S.C. §101(24), and citing Collier on Bankruptcy ¶ 13.04 (16th ed. 2022.) ("[w]here the debtor remains in charge of its own affairs, the debtor itself might be able to appoint its own representative for this purpose, without express court sanction")); *In re Servicos de Petroleo Constellation S.A.*, 600 B.R. at 270 (recognizing as a foreign representative an individual authorized under resolutions to commence a chapter 15 case on behalf of the debtors); *In re Compania Mexicana de Aviacion*, S.A. de C.V., 2010 WL 10063842 (S.D.N.Y. Nov. 8, 2010) (recognizing as foreign representative of a Mexican airline an individual appointed and authorized by the company's board of directors); *In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 413 (N.D. Tex.), *aff'd sub nom. In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012) (holding that possible foreign representatives of a Mexican company include individuals appointed by the company's board of directors).

### C.     The Verified Petition Meets The Requirements Of Section 1515

92.     The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural

requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).  Bankruptcy Code section 1515 provides that a foreign representative "applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition." 11 U.S.C. § 1515(a).

93.    Here, all the requirements of section 1515 of the Bankruptcy Code have been met. First, this Chapter 15 Proceeding was commenced by the Petitioner through the filing of the Verified Petition as required by section 1515(a) of the Bankruptcy Code.

94.    Second, evidence of the existence of the Brazilian Insolvency Proceeding and of the appointment of the Petitioner as the Foreign Representative has been provided to the Court as required under sections 1515(b)(1) and (d) of the Bankruptcy Code.

95.    Third, in accordance with section 1515(c) of the Bankruptcy Code, Mr. Rohr made a statement identifying the Brazilian Insolvency Proceeding as the only foreign proceedings currently pending with respect to the Debtors.

96.    Fourth, the introductory language of section 1517 of the Bankruptcy Code refers to section 1506, which grants the Court discretion to deny relief if it would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  Here, the relief requested by the Foreign Representative is not manifestly contrary to, but rather is consistent with, United States public policy, which courts have construed very narrowly.  *See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 139 n.60 (S.D.N.Y. 2012) (explaining that courts have "uniformly" interpreted the public policy exception "narrowly and applied it sparingly"); *British Am. Isle of Venice*, 441 B.R. at 717 (same).

97.    The public policy exception contained in section 1506 has no application here, and numerous courts have already held that Brazil's insolvency regime does not violate public policy.

*See, e.g., In re Oi S.A.*, 587 B.R. 253, 269 (Bankr. S.D.N.Y. 2018) (finding that a Brazilian *recuperaçao judicial* proceeding is not contrary or prejudicial to the interests of creditors in the United States and that the doctrine of comity supports the granting of relief under sections 1507 and 1521 of the Bankruptcy Code); *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015) (noting that "Brazil has a comprehensive bankruptcy law that in many ways mirrors our own"); *In re Rede Energia S.A.*, 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014) (rejecting argument that Brazilian bankruptcy proceedings violated section 1506 of Bankruptcy Code and concluding that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence").

98.     Recognizing the Brazilian Insolvency Proceeding and enjoining certain actions or proceedings with respect to the Debtors, Pope, and their assets here in the United States will assist the orderly administration of the Debtors' assets and implementation of the restructuring provided in Brazil.  Such orderly administration is demonstrably consistent with the public policy of the United States, as embodied in the Bankruptcy Code.

99.     Accordingly, each of the requirements of section 1517(a) has been satisfied, and entry of an order recognizing each of the Brazilian Insolvency Proceeding as a foreign main proceeding is proper.

### D.     The Debtors Are Entitled To Automatic Relief Under Section 1520

100.     Section 1520(a) of the Bankruptcy Code sets forth statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, *see* 11 U.S.C. § 1520(a), including the application of the automatic stay under section 362(a) of the Bankruptcy Code, which prohibits any act to exercise or obtain possession or control over, or to commence or continue any action against, the debtor and its property within the territorial jurisdiction of the United States that could have been commenced prior to the commencement of

this case.  Thus, once the Court recognizes a foreign main proceeding, no further showing is required to obtain such protections.  *See Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768 F.3d 239, 245–46 (2d Cir. 2014) (holding that section 1520 applies automatically upon granting of foreign main recognition).

### E.    Discretionary Relief Under Section 1521 Should Also Be Granted

101.    To ensure the enforceability in the United States of any orders issued by the Brazilian Bankruptcy Court and to maximize the assets of the Debtors, relief under section 1521 is appropriate.  Specifically, the Foreign Representative respectfully requests that this Court exercise its power under section 1521 (and section 1507) to grant the relief described in ¶ 74 above.

102.    The standard for issuance of relief under sections 1521(a) of the Bankruptcy Code is the same as is required for an injunction.  *See* 11 U.S.C. § 1521(e).  However, the Foreign Representative need not file an adversary proceeding to obtain the relief sought.  *In re Vitro, S.A.B. de C.V.*, 455 B.R. 571, 579 (Bankr. N.D. Tex. 2011) ("Thus, protections afforded under §§ 362 and 105 are available to Vitro SAB prior to recognition of the foreign main proceeding."); *In re Pro-Fit Holdings Ltd*., 391 B.R. 850, 862 (Bankr. C.D. Cal. 2008) ("[T]he relief sought here, the application of § 362 on a provisional basis, does not require an adversary proceeding.").

103.    Accordingly, the following factors applicable to the issuance of an injunction apply to the Verified Petition: (a) a likelihood of success on the merits; (b) a likelihood that the movant will suffer irreparable injury if the injunction is not issued; (c) that the threatened injury to the movant outweighs any damage the injunction might cause the opponent; and (d) that the injunction will not disserve the public interest.  *See JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015).  The Foreign Representative contends that these four factors are easily met.

### F.   Likelihood Of Success On The Merits

104.   The Brazilian Insolvency Proceeding should be recognized.   The Brazilian Insolvency Proceeding are clearly "foreign proceedings" under Chapter 15, and the Debtors' COMI is clearly Brazil.   There is no serious question that the Foreign Representative is entitled to and will succeed in obtaining relief under section 1521 of the Bankruptcy Code and the application of the provisions of section 1521 at that time.   As noted in the 2023 Acceptance Order, the Brazilian Bankruptcy Court granted the 2023 Petition "since . . . the possibility of overcoming the 'economic-financial crisis' of the debtors had been found."   Rohr Decl. ¶ 8, Ex. A.   In addition, it is likely that the Brazilian Insolvency Proceeding will be approved by the Debtors' creditors and sanctioned by the Brazilian Bankruptcy Court, including because the creditors' recovery would be higher than in the case of a liquidation of the Group under the Brazilian Bankruptcy Law.

### G.   Likelihood Of Irreparable Injury If Injunction Is Not Granted

105.   There is undoubtedly a substantial threat of irreparable harm to the Debtors if injunctive relief under section 1521 is not granted.   In particular, injunctive relief providing for the same effects of an automatic stay will (a) aid the stay already imposed by the Brazilian Bankruptcy Law; (b) preserve property in the United States and abroad; and (c) enhance the Debtors' chances to restructure their debt by halting the adverse actions of the Brazilian Financial Creditors that destabilize the Debtors' rehabilitation.

106.   It is well established that irreparable harm to a debtor's estate is present where local actions are not enjoined and can disrupt a foreign proceeding.   *See, e.g., In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum.") (quoting Collier on Bankruptcy ¶ 304.05, at 304–21 (15th ed. rev.

2003)).  The Foreign Representative submits that the second prong of the injunctive relief standard is therefore satisfied under these circumstances.

### H.    Threatened Injury To The Debtors Outweighs Any Damage To Third Parties

107.    The relief requested herein will benefit the Debtors by ensuring an equitable and orderly implementation of the Brazilian Insolvency Proceeding process and maximization of creditor distributions therein.  *See, e.g., In re Crystallex Int'l Corp.*, No. 11-14074, ECF No. 20 (Bankr. D. Del. Dec. 28, 2011) (stating that failing to issue a provisional stay against creditors in a chapter 15 case could "undermine the Foreign Representative's efforts to achieve an equitable result for the benefit of all of the Debtor's creditors").  None of the creditors commencing the U.S. Litigation can enforce their claims against the Debtors in Brazil due to the stay resulting from the Brazilian Insolvency Proceeding.  Leaving the Debtors' assets and restructuring efforts exposed to attack of the Brazilian Financial Creditors in the United States could hinder their ability to conduct operations and emerge from the Brazilian Restructuring Proceeding—a reality that outweighs any perceived harm to any other party.  As reflected in the Pope Declaration, Pope lacks any significant U.S. assets to which any of the U.S. Litigation could attach.  This fact exposes the U.S. Litigation as harassment, rather than a legitimate collection and enforcement effort.  In any event, staying the U.S. Litigation as to both the Debtors and Pope does not cause prejudice to the U.S. Litigation.  A stay simply prioritizes the success of the Brazilian Insolvency Proceeding over individual creditors' collection efforts against an empty shell.  To the extent that, after the resolution of the Brazilian Insolvency Proceeding, creditors wish to pursue guarantors such as Pope, those rights persist.  The goal of protecting guarantors at this juncture seeks to maximize the Brazilian Insolvency Proceeding's success for all creditors and stakeholders.  Accordingly, the threatened injury to the Debtors that would result if relief is not granted under section 1521 clearly outweighs any damage third parties could suffer as a result of such relief.

### I.        Injunction Will Serve Public Interest

108.    The relief requested under section 1521 will not disserve the public interest; on the contrary, granting such relief is in the public interest as it will facilitate a cross-border reorganization that will provide a benefit to the Debtors' creditors.  *See, e.g., Cunard S.S. Co. Ltd. v. Salen Reefer Svcs. A.B.*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").

### J.        Granting Relief Is Proper As Interests Of Creditors And Other Interested Parties Are Sufficiently Protected

109.    The relief requested under section 1521 is founded on the Congressional mandate to cooperate with foreign proceedings and the foreign representative's goal to promote the goals of Chapter 15.  *See* 11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.").  Such relief is appropriate, under section 1521, because it is necessary to ensure the success of the Brazilian Insolvency Proceeding.  The Court may grant such relief, however, "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).  The interests of creditors and all other interested parties are sufficiently protected by the treatment afforded to them in the Proposed Order.  Accordingly, the Court may grant relief under section 1521 because the interests of creditors and other interest entities are sufficiently protected in the Brazilian Insolvency Proceeding.

### K.        No Waiver Of Foreign Representative's Immunity

110.    The order granting this Verified Petition should provide that no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with the Verified Petition, this Chapter 15 Proceeding, any further order for additional relief in this

Chapter 15 Proceeding, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative under section 1510 of the Bankruptcy Code.

## **PRAYER FOR RELIEF**

The Foreign Representative respectfully requests entry of an order in the form of the Proposed Order filed contemporaneously herewith, thereby recognizing the Brazilian Insolvency Proceeding as a foreign main proceeding and granting the other relief requested herein and all such other relief, at law or in equity, to which the Foreign Representative is justly entitled.

Respectfully submitted this 12th day of June, 2024.

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco
SBN 01797600
Joanna D. Caytas
SBN 24127230
Razmig Izakelian *(pro hac vice pending)*
Alain Jaquet *(pro hac vice pending)*
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone:  713-221-7000
Facsimile:  713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com

**COUNSEL FOR FABIO D. ROHR, FOREIGN REPRESENTATIVE**

## VERIFICATION OF PETITION

I, Fabio David Rohr, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I am the authorized foreign representative for the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 12th, 2024

/s/  Fabio D. Rohr
Foreign Representative of SouthRock Capital Ltda., Americana Franquia S.A., Brazil Airport Restaurantes S.A., HB Participações S.A., SRC 5 Participações Ltda., SRC 6 Participações Ltda., SRC Holding Participações S.A., SR N Participações S.A., Star Participações S.A., Starbucks Brasil Comércio de Cafés Ltda., SW do Brasil Ltda., SW Stores do Brasil Ltda., and Wahalla Ltda.