## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Case No. 24-90398 (CML) |
| | § | |
| SouthRock Capital Ltda., *et al.*[1] | § | Chapter 15 |
| | § | |
| | § | |
| Debtors in Foreign Proceeding. | § | (Joint Administration Pending) |
| | § | |

## EMERGENCY MOTION OF FOREIGN REPRESENTATIVE FOR PROVISIONAL RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 1519, 1521, 362 AND 105

**Emergency relief has been requested.  Relief is requested no later than June 14, 2024.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 14, 2024, at 1:30 p.m. in Courtroom 401, 4th floor, 515 Rusk, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at 832-917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Christopher M. Lopez's conference room number is 590153.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click on Judge Lopez's home page.  The meeting code is "Judge Lopez."  Click the settings icon in the upper right corner and enter your name under the personal information setting.**

---

[1] The debtors in these chapter 15 cases, along with the last four digits of each debtor's Brazilian tax identification number, are as follows: (a) SouthRock Capital Ltda. (01-35); (b) Americana Franquia S.A. (01-51); (c) Brazil Airport Restaurantes S.A. (01-73); (d) HB Participações S.A. (01-57); (e) SRC 5 Participações Ltda. (01-02); (f) SRC 6 Participações Ltda. (01-41); (g) SRC Holding Participações S.A.(01-74); (h) SR N Participações S.A. (01-01); (i) Star Participações S.A. (01-09); (j) Starbucks Brasil Comércio de Cafés Ltda. (01-00); (k) SW do Brasil Ltda. (01-20); (l) SW Stores do Brasil Ltda. (01-36); and (m) Wahalla Ltda. (01-10).  The Debtors' mailing and service address is Avenida Paulista, 1294, 14º andar, sala 14, Bela Vista, São Paulo/SP, CEP 01310-915, Brazil.

> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

Fabio David Rohr ("Rohr"), in his capacity as Foreign Representative (the "Foreign Representative" or the "Petitioner") of SouthRock Capital Ltda. ("SouthRock"), Americana Franquia S.A. ("Americana"), Brazil Airport Restaurantes S.A. ("Brazil Airport"), HB Participações S.A. ("HBP"), SRC 5 Participações Ltda. ("SRC 5"), SRC 6 Participações Ltda. ("SRC 6"), SRC Holding Participações S.A. ("SRC Holding"), SR N Participações S.A. ("SRN"), Star Participações S.A. ("Star"), Starbucks Brasil Comércio de Cafés Ltda. ("Starbucks Brazil"), SW do Brasil Ltda. ("SWB"), SW Stores do Brasil Ltda. ("SWS"), and Wahalla Ltda. ("Wahalla") (collectively, the "Debtors"), which are subject of a Brazilian insolvency proceeding pending before the 1st Bankruptcy Court of the Central Forum of São Paulo, Brazil (the "Brazilian Bankruptcy Court") under case number  "1153819-28.2023.8.26.0100," and pursuant to Federal Law No. 11.101 dated February 9, 2005 (as modified, the "Brazilian Bankruptcy Law") of the laws of the Federative Republic of Brazil ("Brazil") (the "Brazilian Insolvency Proceeding" or "RJ Proceeding"), having commenced the above-captioned chapter 15 case in respect of the Debtors (the "Chapter 15 Case") by filing their respective chapter 15 petitions (ECF No. 1 in each of the jointly administered cases) and a *Joint Verified Petition for Recognition of Foreign Main Proceeding and Motion for Order Granting Related Relief Pursuant to Bankruptcy Code Sections 1515, 1517, 1520 and 1521* (the "Verified Petition") (ECF No. 9),[2] seeking foreign main recognition of the Brazilian Insolvency Proceeding, respectfully submits this motion (the "Motion") for entry of an order granting immediate provisional relief pursuant to sections 362 and 105 of title

---

[2]  Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings set forth in the Verified Petition.  In addition, the facts set forth in the Verified Petition are incorporated in this Motion by reference in their entirety.

11, United States Code (the "Bankruptcy Code" or "Code"), making a stay under sections 362 and 105 of the Code applicable with respect to the Debtors, Pope, and their property that is within the territorial jurisdiction of the United States pending recognition by this Court of the Brazilian Insolvency Proceeding.  In support of the requested relief, the Foreign Representative respectfully refers the Court to the Verified Petition and the statements contained in (a) his Declaration as the Foreign Representative of the Debtors (the "Rohr Decl.") (b) the Declaration of Lucas Rodrigues do Carmo, Esq., an attorney specializing in Brazilian restructuring and bankruptcy law (the "Carmo Decl."), and (c) the Declaration of Kenneth Steven Pope (the "Pope Declaration" or "Pope Decl."), which are incorporated herein by reference as if fully set forth herein.  In further support of the Motion, the Foreign Representative respectfully states as follows:

## BACKGROUND

### *Overview of the Debtors And Their Property In The United States*

1.      The Debtors and their affiliated entities (collectively, the "Group") are a large Brazilian food and beverage ("F&B") company operating in Brazil.  Rohr Decl. ¶ 3.

2.      The Group was founded in 2015 by Kenneth Steven Pope ("Pope"), an American entrepreneur who permanently resides in Brazil, and is the Group's Chief Executive Officer and (indirect) majority owner.  *Id.*

3.      At the peak of its business, the Group held exclusive rights to use brands such as TGI Fridays, Subway, Starbucks, and Eataly in more than 1,750 Brazilian locations.  *Id.*, ¶ 4.  In addition, the Group carries out its F&B activities through Debtor Brazil Airport and another affiliate by operating over 30 shops and restaurants in Brazil's busiest airports and highways.  *Id.*, ¶ 17.

4.     Debtor SouthRock is the main holding company of the Group.  Pope owns 89.999% of SouthRock via SouthStone Capital LLC ("SouthStone"), a Texas limited liability company.  *Id.*, ¶ 18.  Within the Group, the other Debtors are (a) sub-holding companies (Brazil Airport, Star, and SWB); (b) special purpose vehicles that the Group used for its borrowing and investment activities (HBP, SRC 5, SRC 6, SRC Holding, and SRN); and (c) operating companies (Americana, Starbucks Brazil, SWS, and Wahalla).  Pope serves as a director of each of the Debtors.  *Id.*, ¶¶ 19–26.

5.     All the Debtors are entities organized under the laws of Brazil and have their registered office and principal place of business in the city of São Paulo.  Also, it is in this Brazilian city that (a) the Debtors (and the overall Group) carry out the business operations generating most of their revenues; (b) the Debtors have their "decision-making center:" (c) the Debtors maintain their central administration, including their cash management and accounting; (d) the Debtors keep their accounts, books, and records; (e) the Debtors (and their Group) hold the majority of their assets; and (f) the majority of the Group's employees reside and work.  *Id.*, ¶¶ 27–29.  In Brazil, the Group employs over 2,350 people and even more indirect employees.  *Id.*, ¶ 4.

6.     To date, Debtor Americana and TGIF Franchisor, a Delaware limited liability company with principal offices located in Dallas, are bound by TGIF Agreement, designating Texas as the governing law and the venue for proceedings arising out of its terms.  *Id.*, ¶ 72.  A termination of the TGIF Agreement would be detrimental to the Debtors' estate and their reorganization, as the Debtors aim to continue operating TGIF restaurants in Brazil during and after their rehabilitation.  *Id.*, ¶ 14.

7.     In addition, the Debtors paid a cash retainer to Quinn Emanuel Urquhart & Sullivan, LLP in connection with this case, and maintains an interest in the unearned portion of these retainer funds at a Houston branch of Bank of America.  *Id.*, ¶ 52.

### *The Group Raises Capital Through The Brazilian Financial Creditors*

8.     For the reasons further described below (¶¶ 13 *et seq.*), the Group's financial situation deteriorated since the COVID-19 pandemic hit Brazil.  Rohr Decl. ¶¶ 5, 53.  Over last years, the Group made great efforts to regain its financial footing, including through a business strategy oriented to the expansion of the Group's activities.  *Id.*, ¶¶ 5, 55.  In that respect, the Group raised capital by, among other things, (a) issuing debentures for R$125 million (or approximately $23.2 million) to two Brazilian funds (the "Debentures"); (b) borrowing a total of R$70 million (or approximately $13.0 million) from Banco Modal and Banco Votorantim S.A., two Brazilian investment banks; and (c) borrowing R$116 million (or approximately $21.7 million) from Banco Daycoval, a Brazilian bank, which assigned its rights to Ibiuna, a Brazilian asset management firm, and two Brazilian entities belonging to Travessia, a Brazilian securitization firm (the Brazilian Funds,  Banco Modal, Banco Votorantim, Ibiuna and Travessia are collectively defined as the "Brazilian Financial Creditors").  *Id.*

9.     Specifically, from October 2020 to July 2023, the Group borrowed R$40 million (or approximately $7.43 million) from Banco Votorantim through debt instruments subject to Brazilian law.  *Id.*, ¶¶ 32, 34.  In October 2020, Debtors Starbucks Brasil and Brazil Airport executed the 2020 Votorantim Notes, under which (a) Starbucks Brasil and Brazil Airport cumulatively borrowed R$20 million (or approximately $3.805 million) from Banco Votorantim; and (b) Starbucks Brasil, Brazil Airport, Southrock, and Pope agreed to repay the principal amount, interest, and additional costs.  *Id.*, ¶ 33.  Then, in July 2022, Debtor Starbucks Brasil issued the

2022 Votorantim Notes for R$20 million (or approximately $3.805 million). *Id.*, ¶ 34. Southrock and Pope guaranteed these 2022 notes, assuming the debt as principal debtors. *Id.*

10. From July 2021 to December 2021, Debtor HBP issued Debentures for R$125 million (or approximately $23.2 million) to the Brazilian Funds pursuant to the Indentures. *Id.*, ¶¶ 5, 36–37, 39. Debtors Starbucks Brasil and Star, along with Pope, are "Sureties" of the Debentures. *Id.*, ¶¶ 37, 39. Moreover, in connection with the issuances of the Debentures, Pope and the Brazilian Funds entered the Capital Commitment Letters, requiring Pope to make one or more capital contributions to Starbucks Brasil or HBP if the latter fails to pay debt due to any of the Brazilian Funds.[3] *Id.*, ¶¶ 38, 40.

11. In late 2022, Debtors Starbucks Brasil and Wahalla issued 116,000 Ibiuna Notes, borrowing a total of R$116 million (or approximately $21.57 million) from Banco Daycoval, which simultaneously assigned its credits to the Ibiuna Group. *Id.*, ¶ 43. To borrow R$116 million, Starbucks Brasil and Wahalla committed to paying monthly installments until October 2026 and December 2027, respectively. *Id.*, ¶¶ 44–45. SouthRock and Pope guaranteed the Ibiuna Notes. *Id.*, ¶ 46.

12. In early 2023, Debtor Starbucks Brasil executed the Modal Note borrowing R$30 million (or approximately $5.58 million) from Banco Modal. *Id.*, ¶ 48. In connection with it, Pope and Banco Modal entered the Guaranty Agreement, pursuant to which Pope guaranteed the payment of the Modal Note.[4] *Id.*, ¶ 49.

---

[3] The Debentures are governed by Brazilian law, while the Capital Commitment Letters by New York law. Rohr Decl. ¶¶ 37, 39, 77. In addition, pursuant to and in connection with the Capital Commitment Letters, Pope submitted to New York jurisdiction. *Id.*, ¶ 77.

[4] The Modal Note is governed by Brazilian law, while the Guaranty Agreement by Texas law. Rohr Decl. ¶¶ 48–49. Further, in connection with the Guaranty Agreement, Pope agreed to submit to the non-exclusive jurisdiction of the courts in Harris County, Texas. *Id.*, ¶ 76.

*Events Leading To the Debtors Financial Distress*

13.     The COVID-19 pandemic significantly impaired the Debtors' business activities, including by forcing the Group to close its restaurants and coffee shops for several months.  Rohr Decl. ¶ 53.  Indeed, in 2020 and 2021, the Debtors' revenues decreased by 95% and 70%, respectively.  *Id*.  Moreover, the pandemic caused (a) high default rates by the Group's suppliers and commercial partners; and (b) increasing costs throughout the production chain, making it extremely difficult for the Group to do business.  *Id*.  In addition, the Debtors' financial situation further deteriorated due to the instability and recession of the Brazilian economy.  *Id.*, ¶ 54

14.     Over last few years, the Group has made great efforts to regain its financial footing, including through a business strategy centered on the expansion of the Group's activities.  *Id.*, ¶ 55.  In that respect, the Group (a) issued the Debentures for R$125 million to the Brazilian Funds; (b) borrowed R$70 million from Banco Votorantim and Banco Modal; and (c) borrowed R$116 million from Banco Daycoval (which assigned its credit to the Ibiuna Group).  *Id.*  But the Group's recovery efforts proved insufficient to overcome its financial crisis, including because the Debtors increasingly struggled with working capital restrictions imposed by its financial institutions.  *Id.*

15.     The more and more precarious financial situation of the Group peaked between September and October 2023, when: (a) the Group defaulted on certain payments owed to the Ibiuna Group and the Brazilian Funds, causing an acceleration of the respective debts; and (b) Starbucks terminated its licensing agreements with the Group.  *Id.*, ¶ 56.

16.     Because of the foregoing, the 2023 RJ Debtors sought the Brazilian Bankruptcy Court's protection by initiating, on October 31, 2023, the Brazilian Insolvency Proceeding.  *Id.*, ¶ 57.

17.     Following the initiation of the Brazilian Insolvency Proceeding, other Debtors of the Group engaged with their respective creditors to compromise their debt out-of-court. *Id*., ¶ 58. However, a few months later, the same creditors pursued aggressive loan recovery practices. *Id*. Accordingly, even the 2024 RJ Debtors had no choice but to seek the protection of the Brazilian Bankruptcy Court by commencing their respective *recuperaçao judicial* proceeding in March 2024. *Id*.

### *The Brazilian Insolvency Proceeding*

18.     On October 31, 2023, the 2023 RJ Debtors filed the 2023 Petition with the Brazilian Bankruptcy Court to initiate the Brazilian Insolvency Proceeding and obtain relief, including a stay of ongoing and potential enforcement proceedings commenced against the 2023 RJ Debtors. *Id*., ¶ 59.

19.     On December 12, 2023, the Brazilian Bankruptcy Court entered the 2023 Acceptance Order. *Id*., ¶ 8.  The entry of the 2023 Acceptance Order stayed multiple enforcement proceedings that creditors commenced in Brazil against the 2023 RJ Debtors for pre-2023 Petition debt. *Id*.  Regarding these multiple attacks against the Debtors, the Brazilian Insolvency Proceeding noted as follows:

> This situation, in addition to causing an immense number of unnecessary conflicts of jurisdiction …, compromises the cash flow and operational activities of the business under reorganization, owing to the blocking of the asset in the specific case, preventing its use precisely at the time of greatest need of the company being reorganized, in addition to disturbing the negotiating environment aimed by Law 11101/2005, which is present during the processing of the court-supervised reorganization…. The worst scenario is to allow creditors, subject or not to court-supervised reorganization, aware of the existence of the process, still seek to utilize the assets of the company being reorganized … in order to further burden the court system with the useless proliferation of procedures, in addition to posing risk on the business that seeks to recover itself.

*Id*., ¶ 8, Ex. A.

20.     On March 11, 2024, the 2024 RJ Debtors also filed their 2024 Petition with the Brazilian Bankruptcy Court. *Id.*, ¶ 10.  On April 30, 2024, the Brazilian Bankruptcy Court entered the 2024 Acceptance Order, entailing a stay of enforcement proceedings against the 2024 RJ Debtors for pre-2024 Petition debt. *Id.*, ¶ 11, Ex. B.

21.     On May 10, 2024, the Brazilian Bankruptcy Court entered the Consolidation Order. *Id.*, ¶ 12, Ex. C.  Accordingly, the Debtors' insolvency proceedings as well as the Debtors' assets and liabilities are substantively consolidated for the purposes of the Brazilian Insolvency Proceeding. *Id.*  The current Brazilian Stay Deadline, applicable to all the Debtors, is October 27, 2024.  Carmo Decl. ¶ 59.

22.     On May 22, 2024, the Judicial Administrator filed a petition, requesting a new procedural timetable because of the Debtors' substantial consolidation.  Rohr Decl. ¶ 56.  If the procedural timetable is accepted by the Brazilian Bankruptcy Court, the Debtors must file their consolidated reorganization plan within fifteen days from the publication of the 2024 Acceptance Order on the Official Gazette.  *Id.*; *see also* Carmo Decl. ¶¶ 13, 61.  Pursuant to this timetable, the Debtors expect that their general creditors meeting will take place starting from July 31, 2024, and that the Brazilian Court will sanction the Debtors' consolidated reorganization plan in or around September 2024.  Rohr Decl. ¶ 57.  The Group is optimistic regarding its court-supervised restructuring, including because, in this scenario, the creditors' recovery is higher than in the event of a liquidation of the Group. *Id.*, 74.

### *U.S. Litigation Initiated By The Brazilian Financial Creditors*

23.     Following the filing of the 2023 Petition, the Brazilian Financial Creditors—which had litigation in Brazil against the Debtors and Pope in connection with the Group's restructuring—started the U.S. Litigation as follows:  Rohr Decl. ¶ 75.

a.  Around mid-November 2023, Banco Modal commenced the Texas Collection Proceeding against Pope to recover the loan of R$30 million that Pope guaranteed via the Guaranty Agreement.  *Id.*, ¶ 76.  The Texas Proceeding, in which Pope is acting *pro se*, is ongoing.  *Id.*

b.  Further, in late November 2023, the Brazilian Funds started the New York Proceeding against Pope.  *Id.*, ¶ 77.  The Brazilian Funds initiated the New York Proceeding to (i) compel Pope to make capital contributions totaling R$270,750,981.05 (or approximately $51.902 million) to certain of the Debtors pursuant to two Capital Commitment Letters; and (ii) seek damages.  *Id.*  In the New York Proceeding, the Brazilian Funds obtained an order attaching Pope's bank accounts.[5]  *Id.*  The New York Proceeding, in which Pope is acting *pro se*, is ongoing.  *Id.*

c.  Moreover, in early May 2024, the Ibiuna Group initiated the Texas Discovery Proceeding against SouthStone (i.e., Pope's investment vehicle) and a trust of which Pope is allegedly a beneficiary.  Through the Texas Discovery Proceeding, the Ibiuna Group seeks discovery from the targets of this proceeding regarding the Group.  *Id.*, ¶ 78.  On June 8, 2024, the Ibiuna Group served a related subpoena on Pope's parents at their home in Texas.  *Id.*

---

[5]  Pope's only assets in the United States consist of (a) a bank account held with UBS with a balance of approximately $21,518.99 (the "UBS Account"); (b) an account held with Goldman Sachs with a balance of approximately $1,152 (the "GS Account"); (c) an account with Bank of America holding approximately $675.46 (the "BoA Account"); and (iv) 100% of equity of SouthStone. Pope Decl. ¶ 4.  Pope held the funds in the UBS Account and the GS Account to pay the legal fees he incurred during legal proceedings for the custody of his children.  *Id.*, ¶ 7.  The BoA Account is funded by alimonies paid by Pope's ex-spouse for the maintenance of their children.  *Id.*, ¶ 8.  SouthStone holds an account with Goldman Sachs with a balance of $18,191.  *Id.*, ¶ 14.

d.  In addition, in or around early May 2024, Banco Votorantim commenced the Florida Enforcement Proceeding against Debtors SouthRock, Starbucks Brasil, Brazil Airport, and Pope. *Id.*, ¶ 79.  Banco Votorantim commenced the Florida Proceeding to record a Brazilian judgement pursuant to Florida's Uniform Out-of-Country Money Judgement Recognition Act.  *Id.*  Pursuant to this Brazilian judgement, Debtors SouthRock, Starbucks Brasil, and Brazil Airport, along with Pope, owe R$7,540,709.27 (or approximately $1.444 million) to Banco Votorantim in connection with the 2020 Votorantim Notes.  *Id.*  In Brazil, this Brazilian judgement cannot be enforced against the Debtors due to the stay under the Brazilian Insolvency Proceeding.  *Id.*, ¶ 80.

e.  Also, in or around mid-May 2024, Banco Votorantim started the Texas Enforcement Proceeding against Debtors SouthRock and Starbucks Brasil, and Pope.  *Id.*, ¶ 81.  To date, neither SouthRock, nor Starbucks Brasil, nor Pope have been served in connection with the Texas Enforcement Proceeding, which appears to be related to the 2022 Votorantim Notes.  *Id.*  In Brazil, also the Brazilian judgement relating to the 2022 Votorantim Notes cannot be enforced against the Debtors due to the stay under the Brazilian Insolvency Proceeding.  *Id.*

24.    The purpose of the U.S. Litigation is to create additional leverage against the Debtors and Pope for debt that remains subject to and stayed by (as to the Debtors) the Brazilian Insolvency Proceeding.  *Id.*, ¶ 82.  To date, Pope had been absorbed by the U.S. Litigation, which consumes time and energy that Pope would have devoted to his strategic and key activities as CEO of the Group.  *Id.*  In particular, the U.S. Litigation restrains Pope's capability to (a) fully focus on

the Group's Brazilian Insolvency Proceeding; (b) negotiate with creditors; (c) raise capital;[6] and

(d) identify new investors and strategic opportunities for the Group's growth during and after its

rehabilitation through the Brazilian Insolvency Proceeding. *Id.* These are all activities that

contribute to the Group's restructuring, protecting thousands of direct and indirect jobs in Brazil,

and maximizing the recovery for all creditors. *Id.*

25.      In contrast, as demonstrated by the Pope Declaration, Pope lacks any significant

assets in the United States that could even begin to justify the time and money being expended on

the U.S. Litigation. The U.S. Litigation can be stayed in aid of the Brazilian Insolvency Proceeding

with zero consequence to the U.S. Litigation—no net benefit to its continuation exists.

### *The Debtors' Filing of the Chapter 15 Case*

26.      The Foreign Representative commenced this Chapter 15 Case to obtain this Court's

recognition of the Brazilian Insolvency Proceeding, extending the effects of the Brazilian

Insolvency Proceeding to the United States and protecting the Debtors from creditors' actions that

disrupt Debtors' orderly and effective Brazilian restructuring.

27.      The Foreign Representative is seeking a provisional stay to provide the Debtors

with (a) a breathing space that will extend to the United States, as well as (b) the stability necessary

to administer the Brazilian Insolvency Proceeding without unnecessary interferences. Specifically,

pending the recognition of the Brazilian Insolvency Proceeding in the United States, the Debtors

aim to (a) protect the TGIF Agreement from a potential termination; and (b) stay the U.S. Litigation

perpetrated by the Brazilian Financial Creditors and other potential U.S. proceedings against the

---

[6]      Among other things, the Group is negotiating a debtor-in-possession financing of R$25 million (or $4.73 million) with certain investors (the "DIP Loan"). *Id.*, 72. The DIP Loan's proceeds will be used to strengthen and grow the Group's ongoing businesses by expanding the number of its stores and renovating those already owned by it. *Id.* Through this strategy, the Debtors expect to generate additional cashflow that will be used to maximize the recovery of all creditors in the Brazilian Insolvency Proceeding. *Id.* The Group expects that this expansion and renovation strategy will increase the Group's revenues by 70%. *Id.*

Debtors and Pope, as they are detrimental to Debtors' reorganization efforts in Brazil.  The urgency

of the relief is especially pressing because the U.S. proceedings are multiplying and the Brazilian

Insolvency Proceeding reached the critical stage where the creditors will be soon called to vote on

the Debtors' consolidated reorganization plan.  The temporary stay will, in turn, facilitate the

success of the Brazilian Insolvency Proceeding and avoid disruptions that can seriously impair it.

28.     Pending recognition of the Brazilian Insolvency Proceeding, the Foreign

Representative is therefore seeking immediate provisional relief from this Court to protect the

Debtors and their orderly reorganization in Brazil.

## JURISDICTION AND VENUE

29.     The Foreign Representative has properly commenced these chapter 15 cases under

sections 1504 and 1509 of the Bankruptcy Code by the filing of a petition for recognition of the

Brazilian Insolvency Proceeding under section 1515 the Bankruptcy Code.

30.     The United States Bankruptcy Court for the Southern District of Texas (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(2).

31.     Venue is proper pursuant to 28 U.S.C. §§ 1410(1) and (3).

32.     The statutory bases for the relief requested herein are sections 105(a), 362, 1519,

and 1521 of the Bankruptcy Code, and rules 1075-1 and 9013-1(i) of the Local Bankruptcy Rules

for the Southern District of Texas (the "Local Rules").

## RELIEF REQUESTED

33.     Pursuant to sections 1519, 1521, 362, and 105 of the Bankruptcy Code, the Foreign

Representative respectfully requests that the Court enter an order (the "Provisional Relief Order"),

granting the following immediate provisional relief pending recognition of the Brazilian Insolvency Proceeding:

   a.  Making section 362 of the Bankruptcy Code applicable with respect to the Debtors, Pope, and their property that is within the territorial jurisdiction of the United States. For the avoidance of doubt and without limiting the generality of the foregoing, the Provisional Relief Order shall impose a stay within the territorial jurisdiction of the United States, applicable to all entities (as such term is defined in section 101(15) of the Bankruptcy Code), of:

       i.  the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Debtors or Pope that was or could have been commenced before the commencement of the Debtors' Chapter 15 Case, or to recover a claim against the Debtors or Pope that arose before the commencement of the Debtors' Chapter 15 Case;

      ii.  the enforcement, against the Debtors, against Pope, or against their property, of a judgment obtained before the commencement of the Debtors' Chapter 15 Case;

     iii.  any act to obtain possession of property of the Debtors or Pope, or of property from the Debtors or Pope, or to exercise control over property of the Debtors or Pope;

      iv.  any act to create, perfect, or enforce any lien against property of the Debtors or Pope;

       v.  any act to create, perfect, or enforce against property of the Debtors or Pope any lien to the extent that such lien secures a claim that arose before the commencement of the Debtors' Chapter 15 Case;

      vi.  any act to collect, assess, or recover a claim against the Debtors or Pope that arose before the commencement of the Debtors' Chapter 15 Case; and

     vii.  the setoff of any debt owing to the Debtors that arose before the commencement of the Debtors' Chapter 15 Case against any claim against the Debtors.

   b.  to the extent section 362 is not applicable, impose a stay pursuant to section 105 equal to the stay sought in a.i-vii above.

   c.  notwithstanding any provision in the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to the contrary (i) the Provisional Relief Order shall be effective immediately and enforceable upon entry; (ii) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in the Provisional Relief Order; and (iii) the Foreign Representative

is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of the Provisional Relief Order; and

d.  such other relief as may be just and proper.

**BASIS FOR RELIEF**

I.  **A PROVISIONAL STAY PENDING THE RECOGNITION OF THE BRAZILIAN INSOLVENCY SHOULD BE GRANTED TO THE DEBTORS AND POPE**

34.  The purposes of the automatic stay are "to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor." *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 998 (4th Cir.), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986).

35.  Pursuant to sections 1519 and 362 of the Bankruptcy Code, on a provisional basis, courts may provide for a stay—protecting the debtor or the property of the debtor within the territorial jurisdiction of the United States—while the recognition of the petition is pending. *In re Manley Toys Ltd.*, No. 16-15374 (JNP), 2018 WL 1033426, at *3 (Bankr. D.N.J. Feb. 14, 2018), aff'd, No. CV 18-11465 (RMB), 2019 WL 3229301 (D.N.J. July 18, 2019).

36.  In the context of a chapter 15, "property of the debtor" is the "equivalent term of art" of "property of the estate," as defined under section 541 of the Code. *In re Irish Bank Resol. Corp. Ltd. (in Special Liquidation)*, 559 B.R. 627, 644 (Bankr. D. Del. 2016); *In re Cinque Terre Fin. Grp. Ltd.*, No. 16-11086 (JLG), 2017 WL 4843738, at *13 (Bankr. S.D.N.Y. Oct. 24, 2017). It is well established that "[a] debtor's contract rights are intangible property of the debtor" and "[t]hose property rights can be and typically are tied to the location of the governing law of the

contract." *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 699 (Bankr. S.D.N.Y. 2017) (citations omitted).

37.     The Debtors should be granted the benefit of a provisional stay while the Court's recognition of the Brazilian Insolvency Proceeding remains pending.  Absent provisional relief, there is no stay applicable in the United States during the period between filing the chapter 15 petition and entry of a recognition order, which makes an anticipated application of the stay necessary to protect the Debtors and their property from creditors or other parties in interest during the period before the recognition hearing.  The Foreign Representatives need not file an adversary proceeding to obtain the relief sought.  *In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 862 (Bankr. C.D. Cal. 2008) ("[T]he relief sought here, the application of § 362 on a provisional basis, does not require an adversary proceeding.").

## II.     A PROVISIONAL STAY PENDING THE RECOGNITION OF THE BRAZILIAN INSOLVENCY SHOULD BE EXTENDED TO POPE

38.     A provisional stay can be extended to a non-debtor when the stay "contributes to the debtor's efforts to achieve rehabilitation." *In re United Health Care Organization*, 210 B.R. 228, 232 (S.D.N.Y. 1997) (internal mark and citation omitted).  The foregoing includes the case where creditor actions against a non-debtor would adversely affect the bankrupt estate because they "would consume time and energy of the non-debtor that would otherwise be devoted to a reorganization effort."  *Id. See also In re North Star Contracting Corp.*, 125 B.R. 368, 371 (S.D.N.Y. 1991) (finding that section 362 of the Bankruptcy Code extended to non-Debtor because "[debtor's] reorganization efforts would be harmed if [the] state lawsuit [was] allowed to proceed against [debtor's President]" because he was "a principal player in the corporation's reorganization process"); *In re Cont'l Airlines*, 177 B.R. 475, 481 (D. Del. 1993) (finding that section 362 protected the debtor' officers and directors because the latter were "heavily involved in [Debtor]'s

reorganization efforts" and litigation against them "would impose burdens both on the directors and on [the Debtor], … would substantially detract from the directors' reorganization efforts and would hinder [the Debtor]'s ability to emerge successfully from bankruptcy under a confirmed plan of reorganization."); *In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995) (acknowledging that automatic stay can be extended to non-debtor through a temporary injunction under section 105 of the Bankruptcy Code "when a third-party's action will have an adverse impact on the debtor's ability to accomplish reorganization."); *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 526 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021) (upholding injunction against a third party because its conduct "would adversely impact the ability of [the debtor] to reorganize.").

39.     If helpful to the debtor's reorganization, adverse actions against a non-debtor guarantor can also be stayed.  *See In re Bailey Ridge Partners, LLC*, 571 B.R. 430, 438 (Bankr. N.D. Iowa 2017) (enjoining litigation against Debtors' members and guarantors because it was detrimental to the reorganization); *see also In re Bernhard Steiner Pianos USA, Inc.*, 292 B.R. 109, 118 (Bankr. N.D. Tex. 2002) (enjoining guaranty claims and judgements against debtor's president and guarantor  because "[t]he Code gives Debtor the right to attempt reorganization," which would be impaired if the non-debtor is "forced to defend the state court lawsuits [that] would be a considerable drain on his time and resources, which would be better used to navigate the Debtor's day-to-day business (and reorganization) efforts").

40.     Pope should be granted the benefit of a provisional stay while the Court's recognition of the Brazilian Insolvency Proceeding remains pending.  Absent this provisional stay, creditors can continue to imperil the Debtors' reorganization in Brazil, hindering the Debtors' efforts to rehabilitate through the Brazilian Insolvency Proceeding by targeting the Group's key

officer and driving force behind the restructuring in Brazil.   The U.S. Litigation, by design, forces Pope to defend himself (acting *pro se*) in multiple proceedings pending across the United States in relation to claims that are subject to a stay in the Brazilian Insolvency Proceeding as to against the Debtors.   The Brazilian Financial Creditors acting in the United States consume substantially all of Pope's time and energy, depriving the Debtors of all the managerial resources that their top officer could otherwise provide to the Group during its day-to-day operations and in relation to the restructuring process undergoing in Brazil.   Indeed, despite his efforts, the U.S. Litigation limits Pope's capacity to (a) negotiate with the Group's creditors; (b) raise additional capital, including through the DIP Loan; and (c) identify other potential investors and strategic opportunities that would be beneficial for the Group's growth and reorganization in Brazil, maximizing the recovery for all creditors—and not only for those who are racing to the courthouse in the United States. Further, ongoing U.S. enforcement actions against Pope and his property—such as his interest in SouthStone that, in turn, owns the 89.999% of SouthRock—could strip the Group from its founder and CEO, who would have no further reason to continue restructuring the Group and guide it towards a successful rehabilitation that would save thousands of direct and indirect jobs in Brazil. The U.S. Litigation, if successful, would have the effect of the related Brazilian Financial Creditors side-stepping the Brazilian Insolvency Proceeding and obtaining control of Debtors' assets outside of the Brazilian Insolvency Proceeding, potentially above and beyond the recovery to which they would be entitled in the Brazilian Insolvency Proceeding, to the detriment of other creditors.

### III.   PROVISIONAL RELIEF IS NEEDED TO PROTECT THE DEBTORS' ASSETS AND THEIR RESTRUCTURING EFFORTS

41.     The Debtors require provisional relief to protect the Debtors' assets to achieve an effective restructuring for the benefit of all stakeholders.  *See* 11 U.S.C. § 1519(a).   Indeed,

provisional relief should be granted "where relief is urgently needed to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1519(a).

42.    Absent provisional relief, the U.S. Litigation (or other potential actions of individual creditors) interferes with the orderly proceeding underway in the Brazilian Bankruptcy Court, placing at risk the Debtors' ability to successfully reorganize. *See, e.g., In re Garcia Avila*, 296 B.R. at 114 (former section 304 case finding that irreparable harm would exist by "permitting the [creditors] to execute their judgments against the bond proceeds, [which would] diminish the recovery available to other creditors and possibly wreck the reorganization efforts"). Also, the Debtors have valuable property in the United States such the TGIF Agreement and other contracts with U.S. entities, which must not be disrupted, as the Debtors continue operating TGIF restaurants in Brazil. Thus, the Debtors require the requested provisional relief to protect the Debtors and preserve their estate, as well as for the purpose of maximizing their chances of being a financially sound enterprise following a successful restructuring.

## IV.    STANDARD FOR RELIEF UNDER SECTION 1519

43.    Section 1519 of the Bankruptcy Code provides for granting provisional relief to foreign representatives pending a ruling on recognition of a petition. Section 1519 provides, in pertinent part:

> a) From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including—
>
> (1) staying execution against the debtor's assets;
>
> (2) entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(3) any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

11 U.S.C. § 1519. Section 1521(a)(6) provides that the Court may continue any relief granted

pursuant to section 1519. 11 U.S.C. § 1521(a)(6).

44.     Section 1519(e) provides that the "standards, procedures, and limitations applicable

to an injunction shall apply to relief under this section." 11 U.S.C. § 1519(e). In the Fifth Circuit,

the general standards for injunction relief require a showing of the following elements: (a)

likelihood of success on the merits; (b) likelihood that the movant will suffer irreparable injury if

the injunction is not issued; (c) that the threatened injury to the movant outweighs any damage the

injunction might cause the opponent; and (d) that the injunction will not disserve the public interest.

*Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist*., 579 F.3d 502, 506 (5th Cir. 2009) (quoting

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Blue Bell Bio-Medical v Cin-Bad, Inc*., 864

F.2d 1253, 1256 (5th Cir. 1989); *see also Dallas Cowboy Cheerleaders, Inc. v. Scoreboard Posters,

Inc*., 600 F.2d 1184, 1187 (5th Cir. 1979). In evaluating these four factors, courts take a "flexible

approach and no one factor is determinative." *In re Calpine Corp*., 365 B.R. 401, 409 (S.D.N.Y.

2007) (internal citations omitted) (citing *Haw. Structural Ironworkers Pension Trust Fund v.

Calpine Corp*., 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006)).

45.     The Foreign Representative contends that the four factors for issuing the requested

relief under section 1519 are met.

## V.     THE MOTION SATISFIES THE ELEMENTS FOR PROVISIONAL RELIEF

### A.     Likelihood of Success on the Merits

46.     There is no reason why this Court should not recognize the Brazilian Insolvency

Proceeding. As set forth in the Verified Petition, the Brazilian Insolvency Proceeding are clearly

a "foreign proceeding" under Chapter 15, and the Debtors' COMI is clearly Brazil. Verified

Petition, ¶¶ 77–87.   The Foreign Representative satisfies the requirements of a "foreign representative" under Bankruptcy Code section 101(24).  *Id.* ¶ 91.  Accordingly, there is no serious question that the Foreign Representative is entitled to and will succeed in obtaining relief under sections 1517 and 1520 of the Bankruptcy Code.  As noted in the 2023 Acceptance Order, the Brazilian Bankruptcy Court granted the 2023 Petition "since . . . the possibility of overcoming the 'economic-financial crisis' of the debtors had been found."  Rohr Decl. ¶ 8, Ex. A.  Further, it is likely that the Brazilian Insolvency Proceeding will be approved by the Debtors' creditors and sanctioned by the Brazilian Bankruptcy Court, including because the creditors' recovery would be higher than in the case of a liquidation of the Group under the Brazilian Bankruptcy Law.

47.     The Court may grant relief under section 1521 of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The granting of additional relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and it is necessary to administer and safeguard the Brazilian Insolvency Proceeding from adverse actions in the United States that target and affect the Debtors, directly (such the proceedings initiated by Banco Votorantim) or through proceedings against the Debtors' apex officer (such those initiated by the other Brazilian Financial Creditors).

48.     Courts within the Fifth Circuit have granted provisional relief substantially similar to the provisional relief sought by this Motion.  Moreover, comity is a central tenet of chapter 15.  *Firefighters' Retirement Sys. V. Citco Grp. Ltd*., 796 F.3d 520, 525 (5th Cir. 2015); *Ad Hoc Group of Vitro Noteholders v. Vitro SAB de CV (In re Vitro SAB de CV)*, 701 F.3d 1031, 1053 (5th Cir.

21

2012).  The United States Supreme Court defines comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895). Here, none of the creditors commencing the U.S. Litigation can enforce their claims against the Debtors in Brazil due to the stay resulting from the Brazilian Insolvency Proceeding.  The U.S. Litigation against Pope seeks to sidestep this rule by asserting fruitless claims against Pope who has paltry realizable assets in the United States. The U.S. Litigation, then, seeks mainly to derail the Brazilian Insolvency Proceeding by needlessly wasting Pope's and the relevant courts' time.

### B.     Likelihood of Irreparable Injury if Injunction Not Granted

49.     The Foreign Representative seeks provisional relief to avert a substantial threat of irreparable harm.  As stated above, absent the imposition of a provisional stay, creditors or other parties in interest may take (or continue to take) action against the Debtors or their assets in the United States, and directly and definitely undermine the restructuring process in Brazil even before this Court has adjudicated the request for recognition of the Brazilian Insolvency Proceeding under chapter 15.  Enjoining U.S. actions that can disrupt a foreign proceeding prevents irreparable harm to a debtor's estate, satisfying this test.  *See, e.g.*, *In re Garcia Avila*, 296 B.R. at 114 ("[I]rreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a single, centralized forum.") (quoting Collier on Bankruptcy ¶ 304.05, at 304-21 (15th ed. rev. 2003)).  The Foreign Representative submits that these facts satisfy the second prong of the injunctive relief standard.

### C.     Threatened Injury to the Debtors Outweighs Any Damage to Third Parties

50.     The relief requested herein will benefit the Debtors by ensuring an equitable and orderly implementation of the Brazilian Insolvency Proceeding.  *See, e.g.*, *In re Crystallex Int'l*

*Corp.*, No. 11-14074 (Bankr. D. Del. Dec. 28, 2011), ECF No. 20 (stating that failing to issue a restraining order against creditors in a chapter 15 case could "undermine the foreign representative's efforts to achieve an equitable result for the benefit of all of the Foreign Debtor's creditors"). Leaving the Debtors exposed to attack of the Brazilian Financial Creditors or other creditors could substantially impair the Debtors' estate and lead to a piecemeal distribution of their assets—a reality that outweighs any perceived harm to any other party. Moreover, a derailment of the restructuring process in Brazil would be damaging for all creditors because their recovery would be lower if the Debtors were to liquidate. As reflected in the Pope Declaration, Pope lacks any significant U.S. assets to which any of the U.S. Litigation could attach. This fact exposes the U.S. Litigation as harassment, rather than a legitimate collection effort. But, in any event, staying the U.S. Litigation as to both the Debtors and Pope while the recognition of the Brazilian Insolvency Proceeding is pending works zero prejudice to the U.S. Litigation. A stay simply prioritizes the success of the Brazilian Insolvency Proceeding over individual creditors' collection efforts against an empty shell. Accordingly, the threatened injury to the Debtors and related effects that would result if relief is not granted under section 1519 clearly outweighs any damage third parties would suffer as a result from granting the relief.

> **D.** **Injunction Will Serve Public Interest**

51.     The relief requested under section 1519 conforms with the public interest because extending the stay facilitates this cross-border reorganization for the benefit of all of the Debtors' creditors. *See, e.g.*, *Cunard S.S. Co. Ltd. v. Salen Reefer Svcs. A.B.*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion."). *See also In re Seatco, Inc.*, 257 B.R. 469, 478 (Bankr. N.D. Tex.), *opinion modified on reconsideration*, 259 B.R. 279 (Bankr. N.D. Tex. 2001) ("The granting of a temporary

injunction does not disserve the public interest. Issuance of the injunction will facilitate the Debtor's successful reorganization which is in the public's interest.").

E.      **All Parties Are Sufficiently Protected**

52.      As required by section 1522(a) of the Bankruptcy Code, all parties are "sufficiently protected" in connection with the provisional relief requested in the Motion.  Relief under section 1519 should only be denied due to a lack of sufficient protection "if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005).  A determination of sufficient protection requires a balancing of the respective parties' interests.  *See CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe, S.A. de C.V.)*, 482 B.R. 96, 108 (Bankr. S.D.N.Y. 2012); *see also In re Toft*, 453 B.R. 186, 196 n.11 (Bankr. S.D.N.Y. 2011) ("[A] court should tailor relief balancing the interests of the foreign representative and those affected by the relief.").  The discretion granted under this provision "typically points in favor of granting relief to [section] 304 petitioners."  *In re Artimm, S.r.l.*, 278 B.R. 832, 837 (Bankr. C.D. Cal. 2002) (discussing discretion to afford similar relief under chapter 15's predecessor).

53.      In the present case, all parties are "sufficiently protected," and no creditors in the United States would be seriously and unjustifiably harmed by the requested Provisional Relief. Plaintiffs in the U.S. Litigation are all non-U.S. entities. The U.S. Litigation need not proceed apace when there are no assets that may be dissipating, and the claims within the U.S. Litigation are preserved.  The provisional stay will maintain and maximize the assets of the Debtors and protect the Debtors' reorganization process pending a determination by this Court of whether the Brazilian Insolvency Proceeding should be recognized.  *See In re Innua Canada Ltd.*, 2009 WL 1025088, at *4 (Bankr. D.N.J. Mar. 25, 2009) (ordering the temporary maintenance of the *status quo* pending recognition of the foreign proceedings as actually serving to benefit creditors "by

allowing for an orderly administration of the Foreign Debtors' financial affairs under the Canadian Proceeding").  At this stage, and even after recognition of the Brazilian Insolvency Proceeding as a foreign main proceeding, all the parties (including creditors currently seeking independent remedies) have an opportunity to participate in the Brazilian Insolvency Proceeding, which necessarily takes account of and balances the needs of the many against those of the individual in a collective, centralized process rather than a piecemeal and destructive race to the courthouse.

54.     Accordingly, the requested relief will protect the Debtors (and all of their stakeholders) and preserve the Debtors' assets pending the Court's determination on recognition, while prejudice to creditors, if any, is extremely limited.  Indeed, the requested relief is timewise limited, given that the Foreign Representative is only seeking that this Court grant the preliminary relief from the date of the hearing on the Motion to the date of the hearing on the Verified Petition.

**F.      Notice Has Been Provided to Known Persons That Would Be Restricted by the Relief Requested in the Motion**

55.     The Foreign Representative will provide notice of this motion to: (a) the Office of the United States Trustee; (b) all persons or bodies authorized to administer the Brazilian Insolvency Proceeding; (c) any other parties as required to receive notice pursuant to Bankruptcy Rule 2002(q); (d) all parties and counsel involved in the U.S. Litigation; and (e) such other entities as this Court may direct (collectively, the "Notice Parties").  The Foreign Representative submits that, in light of the nature of the relief requested, no other or further notice need be given.

**VI.     BASIS FOR EMERGENCY RELIEF**

56.     Pursuant to Bankruptcy Rule 6003, the Foreign Representative requests emergency consideration of this Motion.  The Foreign Representative seeks emergency provisional relief under sections 105(a), 362, 1519 and 1521 of the Bankruptcy Code, staying execution of the Debtors' and Pope's assets and the U.S. Litigation until and through the Court's consideration of

the Foreign Representative's chapter 15 petition filed contemporaneously with this motion.   Prior to entry of a recognition order, the Debtors do not benefit of the protections of the Bankruptcy Code, including the automatic stay.   Emergency provisional relief is necessary to halt or prevent creditors and other parties from engaging in litigation or taking action against the Debtors and their assets in the U.S. that could prejudice and disrupt the Brazilian Insolvency Proceeding, thereby interfering with the Foreign Representative's ability to conduct operations and the reorganization of the Debtors.

## VII.   THE REQUEST FOR PROVISIONAL RELIEF SHOULD BE GRANTED

57.   As set forth above, the Foreign Representative has satisfied the standards for provisional relief under section 1519 of the Bankruptcy Code.   Creditors will suffer no meaningful prejudice, if any, as a result of the provisional relief.   Accordingly, the Motion should be granted.

## CONCLUSION

For the reasons set forth above, the Foreign Representative respectfully requests that this Court grant this Motion in its entirety and grant such other further relief as this Court deems appropriate.

Respectfully submitted this 12th day of June, 2024.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco
SBN 01797600
Joanna D. Caytas
SBN 24127230
Razmig Izakelian *(pro hac vice pending)*
Alain Jaquet *(pro hac vice pending)*
700 Louisiana Street, Suite 3900
Houston, Texas 77002
Telephone:  713-221-7000
Facsimile:  713-221-7100
Email: pattytomasco@quinnemanuel.com
Email: joannacaytas@quinnemanuel.com
Email: razmigizakelian@quinnemanuel.com
Email: alainjaquet@quinnemanuel.com

COUNSEL FOR FABIO D. ROHR,
FOREIGN REPRESENTATIVE

### Certificate of Accuracy

I hereby certify that the foregoing statements are true and accurate to the best of my knowledge.  This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/  Patricia B. Tomasco*
Patricia B. Tomasco